504 P.2d 34

**David R. WILLIAMS, dba Industrial Communications, Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION OF UTAH et al., Defendants.**

No. 12871.

Supreme Court of Utah.

Dec. 7, 1972.

3. Crystal Car Line v. State Tax Commission, 110 Utah 426, 174 P.2d 984.

Walter P. Faber, Jr. of Watkins & Faber, Salt Lake City, for plaintiff.

Vernon B. Romney, Atty. Gen., G. Blaine Davis and Gregory D. Farley, Asst. Attys. Gen., Salt Lake City, for defendants.

CROCKETT, Justice:

The plaintiff seeks reversal of an order of the Public Service Commission which denied his application for a certificate of convenience and necessity to operate a public mobile two-way radio-telephone communication system in the populous central area of Utah, that is, the area known as the Wasatch Front, i. e., Davis, Salt Lake, Utah and Weber Counties, in which reside over 800,000 people, about ⅘ of the population of the state.

The protestant, Mobile Radio Telephone Service Inc. and Mountain Bell Telephone Co. are certificated and presently operate such services to the general public in the same area.

In support of the Commission's order the protestant relies upon the well known and admittedly correct rules of review which give verity to the actions of the Commission and place the burden upon the plaintiff of showing they are in error; that we survey the evidence in the light most favorable to its findings; and that if when so viewed there is any reasonable basis in the evidence to support the findings they will not be disturbed.[1]

The significant point in this case is that plaintiff's attack is not upon the findings of the Commission. On the contrary, he himself places reliance upon the findings. His argument is that he is entitled to application of the rule that if the only reasonable conclusion to be deduced from the findings would be to grant his application, then the refusal was capricious and arbitrary and should be reversed. With that proposition we agree. By analogy, the standard rule of review is applicable here: that the judgment or order must find support in the findings; and conversely, unless the findings support the judgment or order, it cannot stand. More specifically applicable to administrative review: if on the basis of the Commission's findings, its action is so unreasonable that it must be deemed capricious and arbitrary, it should not be sustained.[2]

1. Goodrich v. Public Service Commission, 114 Utah 296, 198 P.2d 995.

2. Chicago, R. I. and P. R. Co. v. United States, 284 U.S. 80, 52 S.Ct. 87, 76 L.Ed. 177, the U. S. Supreme Court held

**12**

The question here then becomes whether, accepting the findings as made by the Commission, its order was justified. The findings pointed out by the plaintiff as indicating to the contrary are:

. . . There is presently being offered to the public in the central Utah area mobile radio service by Mountain Bell Telephone Company . . . and by Mobile Radio Telephone Service, Inc. . . . Each of these two companies indicated that they had held orders for persons desiring service. Mountain Bell had 15 subscribers on a waiting list and Mobile Radio Telephone Service had 12 subscribers on its waiting list. *Additional public witnesses testified to the need for additional mobile radio service, but they had not placed an order for such service with either of the present utilities because of crowded channel conditions.*

\* \* \* \* \* \*

. . . There are approximately 300 *private* radio mobile systems in the Salt Lake City area. *Many of these have been placed in service because of the overloading problems on the channels of the two carriers above referred to. Sev-*

*eral witnesses testified that they would prefer the services of a common carrier were such services adequate.*

\* \* \* \* \* \*

. . . *Mountain Bell Telephone Company . . . will not accept additional subscribers because the present channels are filled to their capacity. This company has no present plans to install additional channels.*

We cannot do other than agree that it seems paradoxical for the Commission to make the findings just recited, particularly the emphasized portions, which indicate that there is an unfulfilled public need for the proposed service, and then to conclude that the granting of the application would be against the public interest.

 There are certain observations which we think appropriate in regard to the problem presented in this case. The primary reason for the granting of monopoly franchises is to avoid wasteful duplication of facilities such as in railroad and telephone services. We therefore do not lose sight of the Commission's responsibility to guard against such duplication and to so regulate such services that the public will receive the most efficient and econom-

---

that where the Interstate Commerce Commission had expressly *found* that all railroad companies, whether or not members of the American Railroad Association, merited reasonable compensation for the use of their cars by other lines, the portion of its *order* which partly exempt-

ed certain "short lines" from paying compensation, while not affording this privilege to other companies similarly situated, was invalid. See also Nat'l Labor Relations Bd. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930.

ical service possible, which includes assuring the stability and continuity of existing services.[3] However, in the instant situation the service to customers is over assigned wave-length air channels, and it does not appear that either the factor of duplication of expensive facilities, or the danger of impairing or destroying existing services is as important as it is with respect to some other utilities such as railroad and telephone mentioned above. In view of those facts, there should be taken into consideration the sound principle which pervades all business activity, that competition is a wholesome and stimulating factor which tends to further the objective to be desired mentioned above: of assuring the public the best possible service in the most economical and efficient manner.

■ Notwithstanding the acknowledged powers of the Commission, and the deference accorded its powers, the statutes governing its procedure provide for a review by this court.[4] This clearly indicates that no "rule of infallibility" should apply. Such a standard, or any pretention thereto, would be difficult to live up to. It is to be assumed that the duty imposed on this court was intended to be a substantial and responsible review of the proceedings of the Commission and not a mere pro forma rubber-stamping of its actions. That is the basis for the rule referred to above that the Commission's action will not be sustained if it is so without foundation in fact or reason that it must be deemed capricious and arbitrary.[5] Applying that observation here: we are led to wonder why the Commission made the findings indicating need for the service applied for and then rejected the application.

There is in the record some indication as to the answer to the question just posed. It appears that the matter of critical concern in this case has arisen because of the dichotomy of control: of the Federal Communication Commission over the assignment of radio channels (wave lengths), and the state Public Service Commission over such communication services within the state.

The representative of the Federal Communication Commission testified that:

. . . the FCC will not grant an applicant a license for mobile radio channels in states where the mobile radio

---

3. Sec. 54–6–4, U.C.A.1953; Mulcahy v. Public Service Comm., 101 Utah 245, 117 P.2d 298; Lakeshore Motor Coach Lines Inc., etc. v. Salt Lake Transportation Co., etc., 21 Utah 2d 422, 446 P.2d 416.

4. Sec. 54–7–16, U.C.A.1953.

5. Footnote 1 above; and see Lake Shore Motor Coach Lines, Inc. v. Bennett, 8 Utah 2d 293, 333 P.2d 1061; same rule as to administrative review, reversing Industrial Commission where award arbitrarily refused, see Bailey v. Industrial Commission, 16 Utah 2d 208, 398 P.2d 545; and similarly so held in Moser v. Industrial Commission, 21 Utah 2d 51, 440 P.2d 23.

business is regulated by state authority unless such applicant has first obtained a certificate of authority from the particular State . . .

In reference to the granting of the plaintiff's application Commission Chairman Hacking stated:

Well—then you get to this situation—there's a growing public need for this type of service, and it's to a degree growing by leaps and bounds. Nobody can fully serve that need—no single party, and maybe no combination of parties can serve that need unless the Federal Communications gives them permission, licensed channels.

So, you get in a situation . . . which come first here, the hen or the egg, and what will the state commission do in the meantime when they're trying to find out whether the egg is going to be coming forth or the chicken—which is going to come first?

\* \* \* \* \* \*

Well, now, you've got the same dog-goned thing here— . . . I don't think it's difficult in this day and age for any applicant to show a pretty strong public need for this type of service . . . . but he can't show that he has those air channels to perform the service . . . and he has got to get the license from somebody else to do that.

It thus appears that this plaintiff is placed in a perplexing position, in common talk sometimes referred to as "between a rock and a hard spot." The FCC won't grant such authority until the applicant has obtained a state certificate, and the PSC won't grant a certificate until he obtains authority from the FCC. Placing any individual in such an untenable position is obviously unreasonable and arbitrary.

From what has been said above, we fail to see any basis in reason for the order denying plaintiff's application. Accordingly, it is reversed. Costs awarded to plaintiff as against protestant. (All emphasis added.)

CALLISTER, C. J., TUCKETT, and ELLETT, JJ., concur.

HENRIOD, Justice (dissenting).

I respectfully dissent, although I agree with the general principles enunciated in the main opinion. It is the application of some of them here, to the exclusion of the others, to which I take exception.

It seems to me that the main opinion lifts out of context small parts of the record in a sort of ad hoc justification for ignoring the overall tenor of the Commission's conclusion, arrived at unanimously and after a lengthy four-day hearing. For example, it points to two or three findings of the Commission that recognize that there may be a temporary overcrowding of channels leading to transmission congestion, which necessarily does not point up immediacy of additional competitive facili-

ties. Other parts of the Commission's conclusions appear to me to say that, conceding present congestion because of not insurmountable difficulties, that aren't too onerous, the evidence indicates that in this comparatively new service to the public, existing franchised operators have indicated that they can and will rectify such deficiencies and hence should be given a reasonable opportunity to do so and thus protect their risk capital and future business, —or else. In other words, I consider that the Commission has visualized the overall situation, is tossing out a warning signal to any existing utility to protect its franchise or lose its brass ring at the next go around on the ever revolving public utilities carousel.

This is simply the exercise of good judgment in my opinion, to perpetuate the heart beat and guts of the public utility concept of protecting risk capital expenditure until the privilege of noncompetitive operation clearly is shown to have been abused.

I think this philosophy is echoed in the finding of the Commission, based on what I think was believable evidence calling for affirmance under existing rules, when the Commission stated that "The protestant . . . has constantly, earnestly and energetically sought to and has *substantially* [1] upgraded and expanded its service to the public since its certification . . .," and

that when congestion was urged it applied to FCC for more channels, the granting of which would "greatly relieve the present congestion and broaden the service," and therefore "That to grant the application herein would be clearly against the public interest."

I consider the quotation from Commissioner Hacking's obvious ipse dixit dictum about the chicken or the egg routine hardly to be dispositive here, even if someone had put it in the Congressional Record. It was no part of the findings and no part of the order.

The record here is full of testimony adduced even by the petitioner itself, indicating little more than grumbling about congestion, with overtones of general satisfaction with existing services.

I think the suggestion in the main opinion that the petitioner is between a rock and a hard spot is not quite realistic, because the existing operator has made application for permission to expand its services, which, if granted, would extricate petitioner from the vise that is not really painful but simply a barrier to its own exploitation of the profit motive.

I would affirm the Commission's order under the statute and the evidence,—some of which is the subject of controversion,—and under the previous decisions of this

[1]. Meaning, I take it "You'd better do more."

court, and in the light of rules for review confirming the Commission if its order is supported by competent evidence which cannot be said to reflect caprice or wholly unsupportive of the Commission's order.