**MOUNTAIN STATES LEGAL FOUNDATION, Plaintiff,**

v.

**UTAH PUBLIC SERVICE COMMISSION; Milly Bernard, Olof Zundel, and Kenneth Rigtrup, as Commissioners thereof, Defendants.**

**No. 16162.**

Supreme Court of Utah.

Sept. 4, 1981.

Maxwell A. Miller, James G. Watt, Kea Bardeen, Denver, Colo., for plaintiff.

David L. Wilkinson, Frank V. Nelson, F. Robert Reeder, James M. Elegante, Sidney G. Baucom, Salt Lake City, for defendants.

STEWART, Justice:

The Utah Public Service Commission ("PSC," or "Commission") granted a general rate increase to Utah Power & Light Co. ("UP&L"). The increase was spread over all customers except heads of households over 65 years of age. They were exempted from the increase as to the first block of 400 kwh per month, except for that part of the increase attributable to a fuel increase pass-through. The reduced revenues resulting from the "senior citizen rate" are made up by other residential customers, and not all remaining customers. Mountain States Legal Foundation ("MSLF") challenges the "senior citizen" rate on the ground that it is an unlawful preference under § 54–3–8 Utah Code Ann. (1953), as amended; not supported by adequate findings; and a denial of equal protection of the laws.

On March 30, 1978, UP&L filed an application to increase its rates and charges to consumers in Utah. The application sought authority to increase its rates by $64,778,000 annually. UP&L also sought, through a separate application, an additional rate increase of $9,207,000. These two applications were consolidated and heard together. As part of the $64,778,000, UP&L requested (1) $8,750,000 to implement prior Commission orders placing the cost of construction work in progress in the rate base, and (2) $8,359,000 to implement prior Commission orders allowing UP&L to account for tax timing differences resulting from the use of accelerated depreciation methods by adopting "normalized accounting" in place of "flow-through accounting." UP&L represented that the increase in revenues would allow a reasonable return on equity which UP&L had theretofore been unable to earn and that authorization of the increased revenue requested was necessary for UP&L to maintain a financially stable condition and to continue to render reliable service to its customers.

The Commission subsequently entered an order granting, on an interim basis, the request for a fuel pass-through increase and authorizing UP&L to increase its rates to recover additional revenue in the amount of $9,207,000. That amount was to be collected proportionately from all customers.

After a hearing on a stipulated revenue increase which had been proposed by UP&L and the Division of Public Utilities, the Commission ruled that a revenue increase of $33,785,000 was justified. In a two-to-one decision, the Commission ruled that the increase in rates should be spread uniformly among all rate classes, except for the "senior citizen rate" which was to go into effect on an interim basis. The Commission ordered that the revenue deficiency created by that rate be spread only among the remaining residential customers and not among all customers.

Thereafter, MSLF was permitted to intervene in UP&L's general rate case on behalf of those of its members who were nonelderly residential customers of UP&L. MSLF petitioned for a rehearing of the Commission's order establishing the senior citizen rate, and the petition was granted. After a further hearing, the Commission, on a two-to-one vote, issued its final "Report and Order" which made permanent the "senior citizen head of household" rate category.

The Commission found that senior citizens were "deserving of separate class status" because, as a group, they "have annual incomes considerably less than that for other family group customer categories headed by younger persons" and that, as a group, they "consume less energy per household than residential units as a whole." The Commission held that these facts—"when considered in connection with Utah Code Ann., § 54–3–1 and particularly that portion of the section added in 1977 providing . . . '[that] just and reasonable may include, but shall not be limited to, the cost of providing service to each category of customer, economic impact of charges on each category of customer, and on the well-being of the State of Utah; methods of reducing wide periodic variations in demand of such products, commodities or services, and means of encouraging conservation of resources and energy' "—justified a separate senior citizen subclass of the residential class. The Commission also ruled that the differential between the rates charged the senior citizen class and the rest of the residential class were not "so disparate as to be preferential or discriminatory." In support of this conclusion, the Commission found that the difference in the rate of return earned by the senior citizen class and the other residential customers was approximately 2% and that that difference was reasonable in light of differences that exist between other categories of customers. That finding is also attacked on this appeal.

Mountain States argues that the senior citizen rate constitutes a required subsidization of senior citizens by other residential customers and that it is not the function of the Public Service Commission to engage in social welfare programs. Specifically, MSLF asserts that senior citizens are not a legitimate class or subclass separate from other residential customers and that the rate extended senior citizens is illegal under § 54–3–8 which prohibits all preferential rates between persons similarly situated.

This Court's scope of review of Commission orders which are attacked for establishing unreasonable or discriminatory rates is narrow. Basic responsibility for rate making policy is vested in the Commission, not the courts. Particularly with respect to reasonableness of rates and discrimination in rate structures is judicial review limited. Section 54–7–16, U.C.A. provides in pertinent part:

The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination.

Deference to the Commission's findings, as required by § 54–7–16, is necessary to provide the stockholders, creditors, debtors, and customers of a regulated company the benefit of the Commission's expertise in a highly complex and technical field. Nevertheless, if the Commission has not acted within the powers delegated to it by the Legislature, or there is no legal basis in fact for the findings of the Commission, or the findings do not rationally support proper legal conclusions, an order is contrary to law and must be set aside. Commission expertise alone is not an adequate basis upon which ultimate findings as to reasonableness of rates and classifications of customers may be based.

It is, therefore, the responsibility of this Court to determine whether the Commission acted outside its jurisdiction, in excess of its lawful powers, or in a manner which is arbitrary and capricious and therefore without legal justification. *Lake Shore Motor Coach Lines, Inc. v. Welling*, 9 Utah 2d 114, 339 P.2d 1011 (1959). See also *Williams v. Public Service Commission of Utah*, 29 Utah 2d 9, 504 P.2d 34 (1972). To enable this Court to determine whether an order is arbitrary and capricious, the Commission must make findings of fact which are sufficiently detailed to apprise the parties and the Court of the basis for the Commission's decision, e. g., *Nader v. Nuclear Regulatory Commission*, 513 F.2d 1045 (D.C.Cir.1975); *Blue Cross of Kansas, Inc. v. Bell*, 227 Kan. 426, 607 P.2d 498 (1980); *Continental Oil Co. v. Oil Conservation*

*Commission,* 70 N.M. 310, 373 P.2d 809 (1962). "[T]he judgment or order [of the Public Service Commission] must find support in the findings ... [and] unless the findings support the judgment or order, it cannot stand." *Williams v. Public Service Commission of Utah,* 29 Utah 2d 9, 11, 504 P.2d 34, 36 (1972). Whether findings and conclusions are supported by substantial, competent evidence is a matter of law. *Mulcahy v. Public Service Commission,* 101 Utah 245, 117 P.2d 298 (1941).

For this Court to sustain an order, the findings must be sufficiently detailed to demonstrate that the Commission has properly arrived at the ultimate factual findings and has properly applied the governing rules of law to those findings. Ultimate findings as to reasonableness and discrimination must be sustained if there are adequate subordinate findings to support them, and there is substantial evidence to support the findings. *Mulcahy v. Public Service Commission, supra.* It is not the prerogative of this Court to search the record to determine whether findings could have been made by the Commission to support its order, for to do so would be to usurp the function with which the Commission is charged.

It is axiomatic in rate making that utilities are barred from treating persons similarly situated in a dissimilar fashion. *State ex rel. Utilities Commission v. The Mead Corp.,* 238 N.C. 451, 78 S.E.2d 290 (1953); *Postal Telegraph-Cable Co. v. Associated Press,* 228 N.Y. 370, 127 N.E. 256 (1920). Reasonable classifications between consumers may be made, but there must be adequate findings of fact, supported by evidence, which demonstrate a rational basis for the classification.

Section 54–3–8, U.C.A., embodies these basic principles. It establishes two standards for evaluating the lawfulness of discriminations. That provision states:

No public utility shall, as to rates, charges, service, facilities or in any other respect, make or *grant any preference or advantage to any person, or subject any person to any prejudice or disadvantage.* No public utility shall establish or maintain any *unreasonable difference as to rates,* charges, service or facilities, or in any other respect, *either* as between localities or as *between classes of service. The Commission shall have power to determine any question of fact arising under this section.* [Emphasis added].

Thus, as between persons, public utilities are prohibited from granting any preference or advantage or subjecting any person to "any prejudice or disadvantage." As between localities or classes of service, public utilities are prohibited from establishing or maintaining "any *unreasonable* difference."

MSLF contends that senior citizens are indistinguishable from the other residential customers and that the lower rate granted senior citizens constitutes a preference which is per se unlawful.

We begin with the general proposition that the power to classify customers according to common characteristics is essential to rational rate making. Appropriate classification of customers, if for no other reason, is necessary to maximize the efficient utilization of plant and equipment and thereby provide the lowest possible rates on an equitable basis. Although § 54–3–8 bans all preferences or discriminations between persons, but only bans unreasonable preferences or discriminations as between classes of service, there is not always a categorical, bright-line difference between the two categories. Rather, the difference is a difference of degree. It is not the case that for rate making purposes all persons within a class are homogenous. As between persons there are always differences, sometimes slight and sometimes not so slight, as to the amount of electricity used, when it is used, the purposes for which it is used, and other factors that may be pertinent. Not every difference can justify a separate class.

Classification of customers must necessarily be accomplished by reference to general characteristics having some rational nexus with the criteria used for determin-

ing just and reasonable rates. Whether cost of service, value of service, or other criteria are used, either alone or in conjunction with each other, classifications of persons must be on the basis of similar—but not identical—characteristics. Were it not so, the PSC would have to establish individual rates for each customer—a wholly uneconomic and impracticable, if not impossible, task. Moreover, no matter what classifications may be established, the disciplines of accounting and economics are not so precise, or so unified on cost allocation theories or the proper theoretical foundations for rate making generally, as to agree on all the relevant factors and standards to be considered in arriving at rates and classifications acknowledged to be equitable. Beyond that, there are broad public policy issues, whether implicitly or explicitly recognized, which are necessarily affected by whatever classifications of customers are recognized.

██ Despite the difficulties inherent in making classifications, the distinction in § 54–3–8 between flatly prohibiting preferences between persons and prohibiting only unreasonable preferences as between classes of persons does have significance. Plainly, the Legislature intended that the Commission have less latitude in classifying persons who are provided the same general type of service than the Commission has in the determination of what constitutes reasonable or ·unreasonable differences between classes and localities. The clear legislative intent is that the Commission

should apply stricter standards in the grouping of customers in the first instance than in determining whether differences between classes constitute unlawful discriminations. It follows that this Court should review with greater care the Commission's findings when there is a claim of a per se preference.

██ In the instant case, the Commission did not purport to establish senior citizens as a separate class; rather it designated them a subclass of the general consumer class.[1] But whether designated a separate class or a subclass, the result is that senior citizens receive favored treatment compared with other residential customers. In this case, therefore, we scrutinize the basis for the preferential treatment with greater care than we would if the question were the reasonableness of a preference between classes.

██ The Commission did not base the rate difference on a cost of service analysis. There is no finding that the cost of providing electricity to senior citizens is less than other residential customers. But neither is cost of service the only basis for determining that a group of consumers constitute a valid class for rate making purposes. Although that standard provides a well-recognized basis for classifying customers, it need not be, and often is not, the sole criterion. *American Hoechest Corp. v. Department of Public Utilities*, 379 Mass. 408, 399 N.E.2d 1 (1980).[2] See Jones, *Judicial*

---

1. The Commission has also recognized other subclasses of the residential class. Lower rates are accorded persons on the basis of whether they have electric hot water heaters and "all electric" homes.

2. In *American Hoechest Corp. v. Dept. of Public Utilities*, the court stated:
 It is "axiomatic in ratemaking" that "different treatment for different classes of customers, reasonably classified, is not unlawful discrimination." *Boston Real Estate Bd. v. Department of Pub. Utils.*, 334 Mass. 477, 495, 136 N.E.2d 243, 254 (1956). While cost of service is a well-recognized basis for utility rate structures, it need not be the sole criterion. *Monsanto Co. v. Department of Pub. Utils.*, 379 Mass. 317, ——, 397 N.E.2d

1110 (1979), and cases cited. See Jones, Judicial Determination of Public Utility Rates: A Critique, 54 B.U.L.Rev. 873, 890–892 (1974). Any number of factors may justify a separate classification. *Boston Real Estate Bd. v. Department of Pub. Utils., supra* 354 Mass. at 495, 136 N.E.2d 243 (particular customer may be placed in separate class because of some or all such factors as size, location or nature of business). *"The nature of the use and the benefit obtained from it*, the number of persons who want it for such a use, and the effect of a certain method of determining prices upon the revenues to be obtained by the city, and upon the interests of property holders, are all to be considered" (emphasis supplied). *Brand v. Water Comm'rs of Billerica*, 242 Mass. 223, 227, 136

*Determination of Public Utility Rates: A Critique,* 54 B.U.L.Rev. 873, 890–92 (1974). Indeed, it has long been recognized that rates may be designed to take into account numerous factors. *Northern Pacific Ry. Co. v. North Dakota,* 236 U.S. 585, 35 S.Ct. 429, 59 L.Ed. 735 (1943).[3]

The Commission's opinion asserts a legal basis for its ruling in the 1977 amendment to § 54–3–1. That section requires that rates and services must be "just and reasonable." The amendment added several criteria to be used in the determination of whether rates are just and reasonable. Section 54–3–1, with the 1977 amendatory language underlined, reads as follows:

All charges made, demanded, or received by any public utility, or by any two or more public utilities, for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, shall be just and reasonable. Every unjust or unreasonable charge made, demanded or received for such product or commodity or service is hereby prohibited and declared unlawful. Every public utility shall furnish, provide and maintain such service, instrumentalities, equipment and facilities as will promote the safety, health, comfort and convenience of its patrons, employees and the public, and as will be in all respects adequate, efficient, just and reasonable. All rules and regulations made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable. The scope of definition "just and reasonable" may include, but shall not be limited to, the cost of providing service to each category of customer, economic impact of charges on each category of customer, and on the well-being of the State of Utah; methods of reducing wide periodic variations in demand of such products, commodities or services, and means of encouraging conservation of resources and energy.

Thus, the Legislature has specifically rejected cost of service as the sole criterion for determining whether a rate is just and reasonable as "to each category of customer," although that standard is recognized as one among several others to be evaluated. Also to be considered are such standards as

N.E. 389, 390 (1922). See *Massachusetts Bay Transp. Auth. v. Boston Safe Deposit & Trust Co.,* 348 Mass. 538, 562–563, 205 N.E.2d 346 (1965) (not only benefit received but also population, extent, and ability to bear the burden are valid criteria for apportioning taxation among municipalities). It was not irrational discrimination to exempt the first 384 kwh of monthly residential electricity usage from a rate increase on the ground that this segment of residential usage had not contributed significantly to the growth in peak-load demand. *Boston Edison Co. v. Department of Pub. Utils.,* 375 Mass. 1, 48, 375 N.E.2d 305, appeal dismissed, 439 U.S. 921, 99 S.Ct. 301, 58 L.Ed.2d 314 (1978). And we have suggested that a discount taxicab fare for elderly and handicapped persons is not invalidly discriminatory. *Town Taxi Inc. v. Police Comm'r of Boston,* 377 Mass. 576, 581–82, 387 N.E.2d 129 (1979). [399 N.E.2d at 3–4.] [Footnotes omitted.]

**3.** In *Allied Chemical Corp. v. Georgia Power Co.,* 236 Ga. 548, 224 S.E.2d 396, at 400 (1976), the court stated:

"However, analyses of costs and studies of market-demand characteristics can take one just so far; ultimately, the setting of rates requires the exercise of experienced judgment." Garfield and Lovejoy, Public Utility Economics, 138 (Prentice-Hall, Inc. 1964).

"It is a generally accepted principle of public utility rate making that differences in the conditions of demand, as among the respective customer classes, indicate that each class has a different capacity and willingness to bear charges. Accordingly, with reference to value-of-service factors, rates are made so as to distribute the approved company-wide cost of service in relation to the capacity and willingness of the customer groups to bear such costs. More specifically each class bears the identifiable costs that can be associated with its service plus the portion of the joint costs that its demand characteristics indicate it can bear, while continuing to consume a satisfactory quantity of service. In addition, the operation of the value-of-service principle in utility rate making extends to the earning of different rates of profit from different classes of customers or service, within the framework of the over-all return approved under regulation." Id. at 143. See generally, id, Ch. 10.

These principles are discussed in Bonbright, *Principles of Public Utility Rates,* ch. VII, Social Principles of Rate Making (Columbia U.Press, 1961); Phillips, *The Economics of Regulation,* Chs. 10 and 11 (Rev. ed. 1972).

"the economic impact of charges on each category of customer," "the safety, health, comfort, and convenience of its patrons," "the well-being of the State of Utah," reduction of "wide periodic variations in demand," and "encouraging conservation of resources and energy."

■ Although the Legislature did not amend the preference statute, § 54–3–8, it necessarily follows that the standards stated in § 54–3–1 must be considered, at least to some extent, in determining whether a rate accorded one group of consumers is preferential. It would be impossible to give proper force and effect to the statutory standards in the rate of return section if the Commission could not deal with classes of customers which have common characteristics based on those standards.

MSLF resists this conclusion with the argument that § 54–3–1 deals only with the reasonableness of rates, and reasonableness of rates is "an entirely different question from whether a rate or charge is discriminatory or preferential when two or more rates or charges compared."

■ It is true, of course, as MSLF points out, that "[a]ll discrimination cases are based upon the relationship of one rate to another." *Mountain States Telephone & Telegraph Co. v. Public Service Commission*, 105 Utah 266, 268, 145 P.2d 790, 791 (1940). But that is only a starting point. If preferences were determined solely on the basis of such a test, industrial, commercial, residential, and all other types of rates would have to be the same, irrespective of all other considerations, including cost of service, market conditions, and the various factors that should be, and generally are, considered in rational pricing decisions. It is discriminations with no rational basis, and discriminations based on factors foreign to the regulatory scheme, which are aimed at by the preference statute.

The criteria set out in § 54–3–1 clearly are not foreign to a proper determination of classifications. These standards are best effectuated, and perhaps in some cases can only be effectuated, if the Commission is accorded the power to classify in such a manner as to implement the purposes underlying those standards. Indeed, it is significant that the Legislature specified that as *"to each category of customer"* the definition of a just and reasonable rate "may include, but shall not be limited to, the cost of providing service" and "the well-being of the State of Utah." [Emphasis added.]

We recognize that several public utility commissions, including Utah, have held that discriminatory rates based solely on age or income of residential customers are invalid preferences. *Re Potomac Electric Power Co.*, 84 P.U.R.3d 250 (D.C.1970); *Re Utah Power and Light Co.*, 29 P.U.R.4th 399 (Idaho 1979); *Re Rate Concessions to Poor Persons and Senior Citizens*, 14 P.U.R.4th 87 (Ore.1976); *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.*, 91 P.U.R.3d 321 (Pa.1971); *Re Mountain States Telephone & Telegraph Co.*, 2 P.U.R.3d 123 (Utah 1954).[4] However, insofar as we have been able to determine, only one appellate court has held a senior citizen electric rate invalid as a preference. *Mountain States Legal Foundation v. Public Utilities Commission*, Colo., 590 P.2d 495 (1979). See also *Colorado Municipal League v. Public Utilities Commission*, Colo., 591 P.2d 577 (1979).

At least one court, however, has reached an opposite conclusion. *American Hoechest Corp. v. Department of Public Utilities*, 379 Mass. 408, 399 N.E.2d 1 (1980), approved on an experimental basis a special rate for low income heads of households over 65. In addition, at least two public utility commissions have approved favorable rate structures for the poor or elderly on an experimental basis. *Re Narragansett Electric*

---

**4.** Several Commissions have rejected special rates based on age or income without reference to preference statutes: See *Re Southern Bell Telephone & Telegraph Co.*, 7 P.U.R.3d 55 (Ala. 1954); *Re Louisville Transit Co.*, 82 P.U.R.3d 1 (Ky.1969); *Re New England Telephone & Tele-*

*graph Co.*, 84 P.U.R.3d 130 (Mass.1970); *Re Central Vermont Public Service Corp.*, 7 P.U.R.4th 67, 76 (Vt.1974); *Washington Utilities & Transportation Commission v. Pacific Power & Light Co.*, 10 P.U.R.4th 449 (Wash.1975).

*Co.*, 23 P.U.R.4th 516 (R.I.1978), approved a reduced rate for certain low income senior citizens; and *Re Consumers Power Co.*, 25 P.U.R.4th 167 (Mich.1978), authorized a senior citizen lifeline electric rate based in part on a cost of service justification. See also *Re Connecticut Light and Power Company*, Nos. 790521, 790522 (Connecticut, March 11, 1980), which held that adjustments in rate structures should be made, as necessary or desirable, to take account of indigency.

Several courts have also approved a flattening of rates in a declining block rate structure based on volume, with the effect of lessening the burden on low income customers. *City of New York v. Public Service Commission*, 17 A.D.2d 581, 237 N.Y. S.2d 617 (1963); *United States Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa.Cmwlth. 173, 390 A.2d 865 (1978); *General Motors Corp. v. Public Utilities Commission*, 47 Ohio St.2d 58, 351 N.E.2d 183 (1976).[5] See also *Re Pacific Telephone and Telegraph Co.*, 32 P.U.R.4th 121 (Cal. 1979), authorized a telephone company to institute a lifeline service for residential customers; *Re Montana Power Co.*, 33 P.U. R.4th 256 (Mont.1979) authorized lifeline rates on a cost justification basis for natural gas service. Compare *Rhode Island Consumer's Council v. Smith*, 111 R.I. 271, 302 A.2d 757 (1973), where the court stated that a commission-compelled senior citizens rate was unlawful, but intimated that such a rate initiated by the power company would be lawful. See also cases collected in Toubman & Ranch, *Recent Decisions On Rate Structure Reform: A Survey With Emphasis On Lifeline Rates*, 10 Clearinghouse Review 607 (1976).

The national impact of the Arab oil boycott, the international oil cartel, and the increasing scarcity of cheap fuels have resulted in dramatically increased fuel costs.

These increased costs, combined with high inflation in the cost of constructing new generating plants, have resulted in substantially escalated prices for electricity, although more so in some parts of the country than in others. The steep escalation in the price of electricity has highlighted the plain fact that electricity, for most people, is indispensable for maintaining health and life. As a consequence, historical methods of rate making are being reevaluated by legislatures and scholars. Thus, the Utah Legislature passed the 1977 amendment to the Public Utilities Act, and the Federal Congress enacted the Public Utility Regulatory Policies Act of 1978, 92 Stat. 3119, 16 U.S.C. §§ 2601 *et seq.* In addition, students of public utility regulation have argued for new approaches in cost allocations and rate structures generally. *Lifeline Electric Rates: Are They Unreasonably Discriminatory*, 83 Dickinson L.Rev. 541 (1979) [hereafter "Lifeline Electric Rates"]; Taubman & Frieden, *Electricity Rate Structures: History and Implications For the Poor*, 10 Clearinghouse Rev. 431 (1976).

It has been contended, for example, that lower rates should be accorded low usage residential customers on what is basically a modified traditional cost of service analysis. The necessary generating capacity of an electric utility is determined by peak load demand. As peak demand grows, new plant and equipment may be required.[6] In some situations, high usage customers may be more responsible for contributing to the need for additional generating capacity, and, conversely, low usage customers may add little, if anything, to the need for additional generating capacity. See generally, Lifeline Electric Rates, *supra*. Thus, depending on the method adopted by the Commission for allocating costs, some low usage customers could properly be burdened with something less than all of a rate in-

---

**5.** In *General Motors, supra*, the court approved a Commission order which approved an increase in rates in the higher energy usage blocks and a decrease in rates in the lower energy usage blocks to promote conservation of energy.

**6.** In some cases, additional electricity may be acquired from other companies. To what extent Utah Power & Light is able to meet new demand by purchases of electricity instead of building new plant and equipment was not addressed by the Commission. But it is clear that part of the rate increase in this case was attributable to construction work in progress.

crease attributable to new plant and equipment, based on traditional rate making concepts.

 Nevertheless, it is not for this Court to set basic rate making policy. We can no more rule *as a matter of law* that the senior citizen rate is per se an unlawful preference than we could rule that it is not a preference. The issue must, therefore, turn on the findings and reasoning of the Commission, for it is the Commission which must make the basic factual determinations. Section 54–7–16.

 Necessarily the utility company also has a role to play in rate making. To a large extent the statutory scheme places responsibility for proposing rates with the utility. Within the limitations imposed by the Public Utility Act and the general policies of the Commission, management decisions are generally accorded some deference, since management is most intimately involved in operating the utility and looking after the interests of customers, creditors, and owners. See *New England Tel. & Tel. Co. v. Department of Public Utilities*, 371 Mass. 67, 354 N.E.2d 860 (1976); *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 302 A.2d 757 (1973). In this regard, we note that UP&L proposed a senior citizen rate essentially in the same form as the rate adopted by the Commission. Nonetheless, the exercise of management prerogatives is still subject to the limitations of the Public Utilities Act, and the Commission must, in all events, provide the necessary findings of fact and conclusions of law.

 In the instant case, the Commission sustained the senior citizen rate solely on the ground that, as a general proposition, senior citizens on the average receive less gross income and consume less power. The critical issue is whether, compared with other residential users, less income and consumption provide a lawful basis for lower rates. As noted, MSLF and the amici contend that public service commissions are not empowered to act on the basis of social policy, and in particular, of subsidizing one group of consumers at the expense of other

consumers. They contend that such policies are solely for the Legislature to make.

MSLF supports this argument by reference to Senate Concurrent Resolution No. 1, adopted March 10, 1977, which states that "[e]nergy prices should be determined by total costs and market place conditions" and that the "state effort to minimize the social problems resulting from energy costs, as in the case of food costs, is the responsibility of social services and not of energy pricing policies."

This Resolution, however, does not settle the issue. In the first place, the term "total cost" is not self-defining, but depends on which of several accounting theories is used to define "total costs." Furthermore, to the extent that a duly enacted statute conflicts with a legislative resolution, the courts are obliged to give effect to the statute as the governing law. Although we would not lightly disregard a legislative resolution dealing with an issue not controlled by law, a resolution is, nevertheless, not law but only a consensus as to a particular policy. The 1977 amendments to § 54–3–1, by permitting consideration of the economic impact of a rate on each category of customer, gave legislative approval, in the form of binding law, to considerations which may relate, directly or indirectly, to "social problems." In all events, it can hardly be gainsaid that utility pricing policies do directly affect a multitude of social as well as economic problems—whether so intended or not. In short, we cannot conclude that the Legislature has flatly precluded a senior citizen rate. Nor is it clear that the Commission would be compelled to find that the "senior citizen rate" does not include all costs, had it ruled on the matter.

Nevertheless, we are compelled to conclude that the Commission's findings in support of the senior citizens rate are inadequate as a matter of law. The Commission must articulate a rational connection between the facts found and the conclusions reached, and the Commission has not done that.

The whole basis for the senior citizen subclass rests on findings of lower consump-

tion and less income than the general residential class. Although there is substantial record evidence to support those findings, the problem is that the Commission has not explained why the lower average income and smaller consumption of senior citizens warrants treating them differently from other residential consumers. The lower average income does not of itself demonstrate less ability to pay. The lower consumption may provide a cost of service justification, as suggested above, but both the record and the findings are silent on the point. Nor has the Commission explained why the shortfall should be borne only by other residential customers instead of all customers.

In the only case known to us which has sustained a somewhat similar rate, the class was limited to heads of household over 65 years of age who received supplemental security income benefits, a class characterized by the court as the neediest of the needy. *American Hoechest Corp. v. Dept. of Public Utilities*, 379 Mass. 408, 399 N.E.2d 1 (1980). Although it is clear that senior citizens generally have been adversely affected by inflation, it does not follow that all, or even the majority of, heads of household over 65, even though they have lower incomes than the average citizen, are less well off financially. The Commission simply made no finding on the point. It may be that for some senior citizens expenses have also decreased along with income. Nor is there any explanation of the relationship between the need for a senior citizen rate and the Commission's rate making policies.

In addition, there are others, not senior citizens, in similar economic conditions. However, the Commission has not explained why it defined the class in the manner it did. It is arguable that the classification is underbroad in that sense, but overbroad in the sense that not all senior citizens have lower incomes or consume less energy than the average population. Perhaps a senior citizen class could be justified on grounds of efficiency in dealing with what may be, for example, a more stable group of customers with fewer credit risks, but the Commission has not supplied us with any such reasons, and it would be nothing less than a speculative enterprise for us to attempt to do so.

Although the Commission exercises a form of legislative power in rate making, it is not the same as the Legislature. The legality and the legitimacy of its orders rest on well-articulated findings and reasons which are in accord with governing law. In administrative matters such as this, there must be findings on all material issues. *Colorado Wyoming Gas Co. v. Federal Power Commission*, 324 U.S. 626, 65 S.Ct. 850, 89 L.Ed. 1235 (1945); *Pan American Petroleum Corp. v. Wyoming Oil and Gas Conservation Commission*, Wyo., 446 P.2d 550 (1968). Only then can the interests of the public, the ratepayers, and the utility be protected. Furthermore, it is not possible for this Court, without such a foundation, to perform its assigned task of judicial review. *Application of Hawaii Electric Light Co., Inc.*, Hawaii, 594 P.2d 612 (1979); *American Can Co. v. Davis*, 28 Or.App. 207, 559 P.2d 898 (1977).

Perhaps a senior citizen class can be sustained; however, it is not for this Court to "supply a reasoned basis for the agency's action that the agency has not given . . . ." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974); nor are we authorized to make findings not made by the Commission. We are compelled to conclude, therefore, that the order is unlawful because there are inadequate findings of fact to support it.

Under the circumstances, it is not necessary to address the equal protection arguments based on the Utah and United States Constitutions or the contention that the difference in rates between the senior citizen class and the general residential class is unreasonably discriminatory.

We are aware that the Commission has under consideration a broad review of rate making policies pursuant to the Public Utility Regulatory Policies Act of 1978, 92 Stat. 3119, 16 U.S.C. 2601. It would be in the interests of orderly procedure, and in keeping with the purpose of undertaking a basic review of rate making criteria in light of

recent economic developments, for the Commission to again consider the adoption of a senior citizen rate, if it so desires, in the same proceedings.

The order of the Public Service Commission establishing the senior citizen rate is accordingly set aside.

HALL, C. J., and HOWE, J., concur.

MAUGHAN, J., heard the arguments but died before the opinion was filed.

CROCKETT, Retired Justice (concurring with added comments) *.

I concur with the main opinion and note my appreciation of the thorough and scholarly treatment of the problem involved. In supplementation thereof, I make some separate observations.

The first and foundational one is that although the defendant utility is a monopoly, subject to regulation by the Public Service Commission, it is nevertheless a private enterprise, and all aspects of its operation should be left primarily to the judgment of its management; subject secondarily to disapproval or control by the Public Service Commission; and only thirdly, and thus somewhat remotely, to interference with or correction by this Court.

The objectives of the utility include the providing of efficient and economical service to the public; and also the long-range plan of so continuing, and of making a profit for itself and those who supply its capital. This involves consideration of a complexity of factors in the formulation of a rate structure that in the judgment of management will best serve those objectives.

According to my view, it is to be conceded that the differing rates charged to customers should not be fixed on the basis of compelling some rate payers to provide charity for others. However, because of the differences in rendering service to and deriving income from different classes of customers, there is justification for charg-

ing different rates to various classes of industrial, commercial and residential users. So long as there is a rational basis for the classification, which the management thinks will help in carrying out the above-stated objectives, and all within the class are treated equally, there is no impermissible discrimination.

As the main opinion suggests, there are a number of factors to which may be given consideration by management in exercising its judgment. This includes that users over 65, who are heads of households, are for the most part, more stable than other users and less apt to be moving about; and that they are therefore to some degree more constant in their patronage, less trouble and expense in billings, and more certain in their payments, resulting in a lower percentage of debt losses. Further, that it may be well to give some recognition to long-time customers, both as a reward to them and as an encouragement to others. This would tend to insure that all of such elderly persons are individual patrons of its service, so that the utility is providing such service to the highest possible percentage of customers in the community. This would serve the purpose of meeting competition with suppliers of other forms of energy, and perhaps of greater importance, of promoting good will for the utility. This is something for which many utilities expend substantial sums.

It also should be stated that the principle of charging lower rates for one class of users as here involved could be overreached to the point of unreasonableness and therefore constitute impermissible discrimination. But as has been observed above, there are the safeguards against such abuses in that the rates are proposed by the utility and are subject to the approval of the Public Service Commission.

Under the standard rule of review of administrative actions, this Court should not invalidate the decisions of management, approved by the Commission, unless it

* CROCKETT, Retired Justice, heard the arguments and acted on this case prior to his retirement.

clearly appears that there is no reasonable justification for the differences in rate structure related to the legitimate objectives of successful and continuing operation of the utility.

On the basis of what has been said in the main opinion, and in these comments, I do not believe it is shown that the rate under attack here reaches the point of being so entirely without a basis in reason that it must be deemed capricious and arbitrary and thus subject to invalidation. Because of the involvement of the public interest, both as to the principles generally, and as applied to this case, I agree with the remand for further proceedings.