**AMERICAN SALT COMPANY, a Delaware corporation, Plaintiff,**

v.

**W.S. HATCH COMPANY, a Utah corporation; the Public Service Commission of Utah; Brent H. Cameron; James M. Byrne; and Brian T. Stewart, Defendants.**

No. 860048.

Supreme Court of Utah.

Dec. 31, 1987.

Charles M. Bennett, Salt Lake City, for plaintiff.

Merlin O. Baker, Salt Lake City, for W.S. Hatch Co.

David L. Wilkinson and Bernard M. Tanner, Salt Lake City, for Public Service Comm'n.

HALL, Chief Justice:

American Salt seeks review of a Public Service Commission (PSC) order dismissing its verified complaint.

American Salt harvests salt from the Great Salt Lake. By early 1984, the surface of the lake had risen to such a level as to endanger American Salt's ability to recover sufficient amounts of salt to satisfy its markets. In order to supplement its inventory, American Salt purchased additional salt from Amax.

In April 1984, American Salt contacted W.S. Hatch Co. (Hatch), a Utah common carrier,[1] about transporting the purchased salt from Amax to American Salt's processing plant. After physically inspecting the hauling route, Hatch entered into an agreement with American Salt pursuant to which Hatch would be paid less than its applicable general tariff (its general commodity tariff) for each of the eleven-mile hauls.

Approximately four miles of the eleven-mile route were over a public road. Accordingly, the hauls were subject to the jurisdiction of the PSC.[2] However, Hatch neither requested nor received PSC approval prior to the hauling to charge a point-to-point rate (a special commodity rate).

Pursuant to the parties' agreement, Hatch hauled salt from April 16 until May 2, 1984. Subsequently, a dispute arose between the parties, and Hatch brought suit in federal district court to recover hauling charges based upon its general commodity tariff.

American Salt then filed a verified complaint with the PSC that sought relief from the imposition of Hatch's general commodity tariff. This request for relief was based in part on the fact that Hatch had made several special commodity rate salt hauls

---

1. Utah Code Ann. §§ 54–2–1 (Supp.1984) (amended 1985, 1986 & 1987), –6–1 (Supp.1985) (repealed 1986).

2. Utah Code Ann. § 54–6–3 (1974) (repealed 1986).

for American Salt's competitor, Morton Salt. The thirty-mile Morton Salt hauls followed a route that included the eleven-mile American Salt route. Hatch charged Morton Salt less than its general commodity tariff.

Hatch in turn filed a motion with supporting affidavits seeking dismissal of the complaint. In September 1985, the administrative law judge who heard Hatch's motion filed his report and proposed order, which included findings of fact and conclusions of law. The report and order, which granted Hatch's motion, were adopted by the PSC, and a subsequent application for rehearing was denied.

American Salt contends that the PSC had the authority and duty to grant its requested rate relief. It first claims that application of Hatch's general commodity tariff in this case is unreasonable and unjust because (1) Hatch will recover a windfall profit, (2) having Hatch haul the salt at the general commodity rate makes no "economic sense" since the hauling charges will cause the cost of the salt to exceed its retail value, and (3) Hatch told the PSC that a lower rate was just and reasonable with respect to the Morton Salt hauls, and the PSC allowed Hatch to charge Morton Salt a special commodity rate. American Salt claims that by denying its requested relief, the PSC allowed Hatch to charge an unjust and unreasonable rate in violation of state law.

The findings of fact and conclusions of law provide in part:

## FINDINGS OF FACT

The Commission finds that there is no genuine issue as to the following material facts:

1. The haul performed by Hatch for American Salt was made, in part, over a public road of the state of Utah.

. . . .

4. At the time of the haul, Hatch had a salt tariff on file that had been proper-ly submitted to and approved by this Commission.[3] The Public Service Commission has examined and approved Hatch's salt tariff on numerous occasions. The Commission has found the salt tariff to be just and reasonable.

. . . .

7. No application was made to this Commission to change the tariff rate applicable to this haul.

. . . .

## CONCLUSIONS OF LAW

. . . .

3. Under the law, American Salt is charged with the knowledge that any haul over the Utah public highways is subject to the laws of the state of Utah and, therefore, to the applicable tariff provisions on file with and approved by this Commission.

4. The salt tariff on file with the Commission is fair and reasonable, and Hatch is legally required to collect the charges for transportation services as provided in said tariff.

5. Any oral or written agreements to charge a rate higher or lower than the published tariff rate, even assuming that such was agreed to by Hatch and American Salt, is void and unenforceable.

6. Any agreement or representation by Hatch that it would accept less than the applicable tariff rate in payment for its services, assuming such agreement or representation was made, is also void and unenforceable.

7. American Salt is required under the laws of the [s]tate of Utah to pay the tariff rate for the transportation services performed and other charges as set forth in said tariff. . . .

The real question before us is whether these findings and conclusions should be disturbed. Since American Salt does not contest the three quoted findings that control the resolution of this case, we turn to

**3.** Utah Code Ann. § 54–3–6 (1986) provides in part that a common carrier subject to title 54 may not engage in hauling "until its schedules of rates, fares[,] charges and classifications . . . have been filed and published. . . ."

the question of whether Hatch was entitled to judgment as a matter of law.

Because the basic responsibility for controlling utility rates is vested in the Commission and not in the courts, the legislature has narrowly prescribed our review of Commission orders that are attacked as allowing unreasonable or discriminatory rates.[4] Of course, if the Commission is without jurisdiction to grant a petitioner's requested relief based on a claim of unfair, unjust, and discriminatory rate practices, we will not disturb its order denying relief.[5]

■ All charges made, demanded, or received by Hatch for hauling services performed over public roads must be just and reasonable.[6] The PSC has broad power and authority to regulate Hatch and control its rates with respect to the hauls in this case since the hauling took place over a public road.[7]

■ A just and reasonable rate is one that is sufficient to permit a utility to recover its costs of service and earn a reasonable return for its enterprise.[8] When investigating the reasonableness of a rate, the PSC considers the utility's historical income and cost data, as well as predictions of future costs and revenues.[9] Other factors are involved in the balancing process as well.[10] Thus, whether a general tariff is just and reasonable under title 54 turns on many factors, not on the facts surrounding a given shipment viewed in isolation.

■ When a shipper requires a special rate due to irregular circumstances surrounding an isolated shipment, the proper course of action is for the common carrier to apply for a special commodity rate.[11] Indeed, Hatch sought special commodity rates for the Morton Salt hauls, and special rates were approved.

■ A common motor carrier's request for a special commodity rate predicated upon irregular circumstances must be sought and approved prior to the hauling for which the tariff is requested. This concept was thoroughly explained in *Utah Department of Business Regulation v. Public Service Commission*,[12] where we analyzed the PSC's authority to control utility rates in light of the general purpose underlying Utah's general utility ratemaking provisions. There, we held that "all ratemaking must be prospective in effect" in order to protect the balance of risk between utilities and consumers, and we overturned a PSC order that effectively granted Utah Power & Light Company a retroactive rate increase.[13] This principle is equally applicable to special tariffs in the common motor carrier context as well. Thus, granting the relief requested by American Salt would have been beyond the PSC's authority and therefore improper since an application for a special commodity rate was not made prior to the hauling in question.

4. *See Mountain States Legal Found. v. Public Serv. Comm'n,* 636 P.2d 1047, 1051 (Utah 1981).

5. *Cf. id.* at 1051.

6. *See* Utah Code Ann. §§ 54–2–1(30) (Supp. 1984) (amended 1985, 1986 & 1987), –3–1 (1986), –6–1 (Supp.1985) (repealed 1986), –6–2 to –3 (1974) (repealed 1986); *see also* Utah Code Ann. §§ 54–4–4(1), (3), –7–20 (1986).

7. *See* Utah Code Ann. §§ 54–2–1(30) (Supp. 1984) (amended 1985, 1986 & 1987), –4–1, –4–4 (1986), –6–1 to –4 (1974 & Supp.1985) (repealed 1986); *see also Utah Power & Light Co. v. Public Serv. Comm'n,* 712 P.2d 251, 252 (Utah 1985); *Fuller–Toponce Truck Co. v. Public Serv. Comm'n,* 99 Utah 28, 33, 96 P.2d 722, 724 (1939).

8. *See Utah Dep't of Business Regulation v. Public Serv. Comm'n,* 614 P.2d 1242, 1248 (Utah 1980).

9. *Utah Dep't of Business Regulation v. Public Serv. Comm'n,* 720 P.2d 420 (Utah 1986); *see also Utah Dep't of Business Regulation,* 614 P.2d at 1248; Utah Code Ann. § 54–4–4(3) (1986); *but see* Utah Code Ann. § 54–7–1 (1986) (amended 1987).

10. *See Mountain States Legal Found.,* 636 P.2d at 1054–55, 1057; Utah Code Ann. § 54–3–1 (1986).

11. *See* Utah Code Ann. §§ 54–3–3, –7, –4–1 (1986), –7–12(4)(b)(i) (1986) (amended 1987).

12. 720 P.2d 420.

13. *Id.* at 423–24.

The PSC properly observed this principle in its order denying rehearing:

> We do not disagree with Complainant's characterization of the result in this case as being harsh and, at least from its perspective, unfair. Complainant contracted to pay—and doubtless budgeted accordingly—one amount only to find that when time came for payment, it owed three or four times what it had anticipated. The only basis for the increase in charges is the fact that the service was performed over a public and not a private roadway; the increase was not based upon increased costs to Respondent.
>
> Notwithstanding our sympathy for Complainant's predicament, we are constrained by the force of case law relevant to the issues here to sustain our earlier order; nothing offered in the Application for Rehearing suggests that the case law has changed. *The tariff rates must be charged and collected unless prior specific authorization from this Commission is obtained.* In the event that it is demonstrated that a carrier is intentionally misleading shippers to his pecuniary advantage, the Commission could and certainly would reconsider the fitness of such a carrier to hold an operating authority; however, that does not change the policy and requirement of law concerning tariffs and Complainant cannot be helped.

(Emphasis added.)

American Salt, however, relies on Utah Code Ann. § 54-7-20(1) (1986) to support its contention that the PSC had the power to grant what is, in effect, retroactive rate relief.[14] Our decisions concerning the prohibition against retroactive rate relief un-dermine this position. Furthermore, this Court, in an opinion construing section 54-7-20's predecessor statute, disallowed reparations where the applicable general tariff had been charged. In *Denver & Rio Grande Railroad v. Public Utilities Commission,*[15] the Public Utilities Commission, relying on language substantively identical to section 54-7-20, ordered the petitioner/utility to pay reparations to a shipper. The Commission's order was based in part on a finding that one of the petitioner's competitors had a lower tariff to move the same commodity between the same general locations. Since the competitor was moving property between the same general areas for a rate below that of the petitioner's, the Commission found the petitioner's higher tariff unreasonable and unjust and ordered the petitioner to make reparations. In reversing that order, this Court stated:

> We think it plain from the language of the statute that the power of the commission to order reparations is limited to cases where charges have been made in excess of the schedules, rates, and tariffs on file with the commission, or discriminations made under such schedules. That was the view [previously] taken by the commission itself, and approved by this court.[16]

The case of *Bonfils v. Public Utilities Commission,*[17] relied upon by counsel for American Salt at oral argument, supports this view. In that case, two orders had been entered by the Colorado Public Utilities Commission's predecessor, the Colorado Railroad Commission. The orders established rates for hauling coal by rail between two areas. Bonfils petitioned the

---

**14.** The provision provides:

> (1) When complaint has been made to the commission concerning any rate, fare, toll, rental or charge for any product or commodity furnished or service performed by any public utility, and the commission has found, after investigation, that the public utility has charged an amount for such product, commodity or service in excess of the schedules, rates and tariffs on file with the commission, or has charged an unjust, unreasonable or discriminatory amount against the complainant, the commission may order that the public

utility make due reparation to the complainant therefor, with interest from the date of collection.

**15.** 73 Utah 139, 272 P. 939 (1928).

**16.** *Id.* at 141-42, 272 P. at 940 (citations omitted); *see also Utah–Idaho Cent. Ry. v. Public Util. Comm'n,* 64 Utah 54, 57-59, 227 P. 1025, 1026-27 (1924).

**17.** 67 Colo. 563, 189 P. 775 (1920).

Colorado Public Utilities Commission, claiming that a railroad had charged it in excess of the tariff specified in the two orders and requesting reparations. The Commission's order held, in relevant part, "that the amount of reparation to be granted should be the difference between the rates charged *and the rates which the commission should find to have been reasonable at the time the transportation services were rendered....*" The order also stated *"that the orders made by the Railroad Commission in two cases hereinafter mentioned do not establish rates which the commission must accept as reasonable rates for the periods covered by said orders...."* [18] In reversing the Commission's order, a majority of the Colorado Supreme Court held:

> The commission erred, also, in denying that the rates established by the Railroad Commission for the said two periods must be accepted as the reasonable rates for those terms. The law creating said commission determines the question.
>
> ....
>
> These orders are findings or decisions of the commission, and are clearly within this section, and thus binding upon the successor of the old commission.
>
> ....
>
> It follows that the orders fixing rates were binding upon respondents.... [19]

Certainly, *Bonfils* is not authority for the proposition that section 54–7–20 grants the PSC authority to allow retroactive rate relief.

In passing, we note that as for the proposition that it is entitled to rate relief, American Salt's reliance on *Mountain States Legal Foundation v. Utah Public Service Commission* [20] is misplaced. In that case, the plaintiffs sought review of an order granting Utah Power & Light a general rate increase and establishing a "senior citizen rate." Since that case did not involve retroactive rate relief, it has no application in this case.

In this case, the general commodity tariff was the only tariff on file which could properly be applied to the shipments in question. The Commission could not order reparations under the statute. [21]

■ American Salt next claims that despite the PSC's authority to act, the PSC violated its duty to prevent discriminatory rate practices by denying the requested relief. The argument is that by denying such relief, the PSC allowed Hatch to charge American Salt more than it charged Morton Salt for essentially the same hauling service. American Salt relies upon Utah Code Ann. §§ 54–3–8 (preferences and discriminatory practices prohibited), 54–3–6(2), and 54–3–7 (1986) (common carriers must extend uniform contracts to shippers).

The problem with American Salt's argument is that it bases its claim of discrimination on the difference between Hatch's general commodity tariff and the special commodity rate approved for the Morton Salt hauls. When a shipper is subject to the same circumstances underlying a special commodity rate, it cannot claim it has been discriminated against because it is charged a general commodity tariff where the shipper's carrier has not applied for a special commodity rate prior to the hauling in question. Ruling otherwise would create a loophole in the fundamental principle underlying the statutory scheme pursuant to which the PSC controls utility rates: all ratemaking must be prospective.

Moreover, a ruling in favor of American Salt would be at variance with the broad authority granted the PSC to police utility rates [22] and might encourage carriers to ignore the mandates of title 54. Adoption of American Salt's proposition could easily prompt common carriers to negotiate cut-rate contracts for regulated hauls. If subsequent to such a haul a competitor could

---

**18.** *Id.* at 564, 189 P. at 775 (emphasis added).

**19.** *Id.* at 574, 189 P. at 779.

**20.** 636 P.2d 1047.

**21.** *See Denver & Rio Grande R.R.,* 73 Utah at 142, 272 P. at 940.

**22.** Utah Code Ann. § 54–4–1 (1986).

show some unfairness or discrimination in being charged a general tariff based upon the similarities between its business and the business of the shipper who received the cut-rate hauling services, the cut rate would automatically become an enforceable rate, despite the fact that it was not approved prior to the hauling. In short, a ruling in favor of American Salt would allow what in effect would be tariffs by estoppel.

Other shortfalls in American Salt's position become clear when it is analyzed under the facts of this case. At oral argument, counsel for American Salt explained that salt is a very competitive commodity. Were we to rule in favor of American Salt, every other salt haul transacted pursuant to Hatch's general commodity tariff would be subject to a claim of discrimination based upon the cut rate offered American Salt. After each salt shipment conducted by Hatch, the shipper could claim that it was discriminated against based upon the competitive nature of salt. When the common carrier sued in a court of law to recover its published and approved tariff, the shipper could turn to the PSC, where it would be entitled to a hearing and a review of the PSC's decision while the common carrier suit languished in court. It is totally unreasonable to suggest that the legislature intended such a state of affairs under title 54. Were it so, the PSC would in effect have to establish individual rates for each salt shipper, "a wholly uneconomic and impracticable, if not impossible, task." [23]

The fact that the Commission did not make a finding concerning discrimination is insignificant. As stated above, the Commission recognized the principle of law controlling this case and properly applied the same. Thus, this is not a case where the findings are not "sufficiently detailed to demonstrate that the Commission has properly arrived at the ultimate factual findings and has properly applied the governing rules of law to those findings." [24]

The hauls made by Hatch for American Salt were made over a public road and were therefore regulated.[25] The law clearly requires that Hatch charge and receive the applicable general tariff absent an order to the contrary.[26] Here, no such order was sought prior to the hauling in question, so Hatch is entitled to collect the general tariff. Because the PSC had no authority to grant the relief requested, Hatch was entitled to judgment below. Therefore, we do not disturb the Commission's findings, conclusions, or order.

American Salt also contends that Hatch contracted to obtain a special tariff and breached the covenant to American Salt's detriment and suggests that Hatch misrepresented or misled American Salt concerning the applicable charges. Because the PSC did not have the authority to grant American Salt's requested relief, we need not address these issues.

Affirmed. No costs awarded.

WE CONCUR:

STEWART, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

HOWE, Justice (concurring):

I concur. It is my understanding that the last paragraph of the Court's opinion

**23.** *Mountain States Legal Found.,* 636 P.2d at 1053.

**24.** *Id.* at 1052.

**25.** *See* Utah Code Ann. § 54-6-3 (1974) (repealed 1986).

**26.** Utah Code Ann. § 54-3-6(2) (1986) provides, in pertinent part:

No common carrier shall charge, demand, collect or receive a greater or less or different compensation for the transportation of ... property, or for any service in connection therewith, than the rates, fares and charges applicable to such transportation as specified in its schedules filed and in effect at the time; nor shall any such carrier refund or remit, in any manner or by any device, any portion of the rates, fares or charges so specified, except upon order of the commission as hereinafter provided, or extend to any person any privilege or facility in the transportation of ... property except such as are regularly and uniformly extended to all persons.

*See also Union Pac. R.R. v. Sterling H. Nelson & Sons, Inc.,* 552 P.2d 649 (Utah 1976).

means that the Public Service Commission did not have jurisdiction to determine the validity of American Salt's claims. Whether Hatch breached its agreement by failing to obtain the Public Service Commission's approval of the reduced tariff which the parties agreed upon, or whether Hatch misrepresented the applicable tariff may appropriately be presented for determination to a court of law.