UTAH DEPARTMENT OF BUSINESS
REGULATION, DIVISION OF
PUBLIC UTILITIES, Plaintiff,

v.

PUBLIC SERVICE COMMISSION OF
UTAH; Brent H. Cameron, Chairman;
David R. Irvine, Commissioner; and
James M. Byrne, Commissioner, Defendants.

COMMITTEE OF CONSUMER
SERVICES, Plaintiff,

v.

PUBLIC SERVICE COMMISSION OF
UTAH; Brent H. Cameron, Chairman;
David R. Irvine, Commissioner; and
James M. Byrne, Commissioner, Defendants.

Nos. 19361, 19362.

Supreme Court of Utah.

May 22, 1986.

Rehearing Denied June 30, 1986.

David L. Wilkinson, Atty. Gen., Stephen G. Schwendiman, Craig R. Rich, Salt Lake City, for plaintiffs.

Thomas W. Foresgren, Rosemary Richardson (Utah Power), Public Service Commission, Patrick J. Oshie, Atty. Gen. Office, Salt Lake City, for defendants.

ZIMMERMAN, Justice:

The Department of Business Regulation asks this Court to reverse two orders issued by the Utah Public Service Commission ("PSC") which allowed Utah Power & Light ("UP & L") to transfer $6 million from an energy balancing account ("EBA") to UP & L's general revenue account. The Department of Business Regulation argues that the PSC's actions amounted to retroactive rate making. We agree and reverse.

Some background discussion concerning utility rate making is necessary to a consideration of the issues presented. Following lengthy hearings, utility rates are fixed prospectively by the PSC. U.C.A., 1953, § 54–4–4(1), and § 54–7–12(1)–(2) (Repl.Vol. 6A, 1974, Supp.1985). In determining an appropriate rate, the PSC considers the utility's historical income and cost data, as well as predictions of future costs and revenues, and arrives at a rate which is projected as being adequate to cover costs and give the utility's shareholders a fair return on equity. *Utah Department of Business Regulation v. Public Service Commission*, Utah, 614 P.2d 1242, 1248 (1980). To provide utilities with some incentive to operate efficiently, they are generally not permitted to adjust their rates retroactively to compensate for unanticipated costs or unrealized revenues. *See* U.C.A., 1953, § 54–4–4 (Repl.Vol. 6A, 1974, Supp.1985); *see also Southern California Edison Co. v. Public Utilities Commission*, 20 Cal.3d 813, 144 Cal.Rptr. 905, 905–06, 576 P.2d 945, 945–46 (1978). This process places both the utility and the consumers at risk that the rate-making procedures have not accurately predicted costs and revenues. If the utility underestimates its costs or overestimates revenues, the utility makes less money. By the same token, if a

utility's revenues exceed expectations or if costs are below predictions, the utility keeps the excess. Overestimates and underestimates are then taken into account at the next general rate proceeding in an attempt to arrive at a just and reasonable future rate.

Fuel costs comprise a substantial portion of a utility's operating expenses. Historically, these costs did not fluctuate wildly. However, in the early 1970's, rapid and unanticipated escalation of fuel costs had devastating effects on utility earnings. Because of statutory limitations that prohibit utilities from recovering for past underestimates of costs, and the length of time required to obtain a rate increase to adjust for future cost increases, these fuel costs posed a substantial enough threat to the utilities' financial health to prompt a request for legislative relief.

In 1975, the legislature modified the utility regulation statutes to permit the PSC to deal with the problem of escalating fuel costs outside of general rate-making proceedings. 1975 Utah Laws, ch. 166, § 2. Under this legislation, the PSC was authorized to permit utilities to pass increased fuel costs through to ratepayers without the requirement of lengthy hearings. Tentative orders permitting increased rates adjusted for fuel costs could be entered before detailed hearings on the need for the rate increase were held. Provision was also made for accelerated hearings to determine the need for the increase. In such hearings, the PSC was required to consider only whether there was a need to increase that component of the rate attributable to energy or fuel costs, rather than the overall reasonableness of the rates proposed, as is normally required in general rate proceedings. The legislature was careful to limit such accelerated pass-through procedures to use in connection with increased fuel or energy costs. All other utility costs were to be considered only in general rate-making proceedings.[1]

Subsequent to and independent of the pass-through legislation, the PSC undertook to design a rather unique device for handling not only the utilities' unstable fuel costs, but also other cost and revenue items which the PSC felt were subject to rapid and unpredictable fluctuation. This device was the energy balancing account, or "EBA," that was created in 1979 by order of the PSC. *Report & Order,* Case No. 78–035–21, 79–035–03, pp. 14–17, paras. 31–34 (July 20, 1979).

The EBA was meant to monitor costs incurred and revenues derived from a number of unstable items. The PSC had found that not only were fuel costs subject to rapid fluctuation, but also revenues from nontariff and surplus energy sales, and the cost of the utilities' own energy purchases varied widely from year to year. The PSC's order therefore allows utilities to set up separate energy balancing accounts to keep track of these items of cost and revenue. These items of cost and revenue are apparently not included in fixing the general rates; however, the utilities were authorized to seek the establishment of a separate EBA rate to take into account fore-

---

1. These changes were made by adding a new subpart to section 54–7–12 of the Code in 1975. 1975 Utah Laws, ch. 166, § 2. That subpart has been modified several times since 1975, always with the apparent purpose of assuring a speedy pass-through of increased fuel costs and of clarifying the procedures to be followed. *See* 1976 Utah Laws, ch. 26, § 1; 1981 Utah Laws, ch. 215, § 4; 1981 Utah Laws, ch. 218, § 1. None of these changes have altered the essential purpose of the original legislation. The present fuel cost pass-through provision reads as follows:

   If a public utility files a proposed rate increase based upon an *increased cost to the utility for fuel or energy* purchased or ob-
tained from independent contractors, other independent suppliers, or any supplier whose prices are regulated by a governmental agency, the commission shall issue a tentative order with respect to the proposed increase within 10 days after the proposal is filed, unless it issues a final order with respect to the rate increase within 20 days after the proposal is filed. A public hearing shall be *held by the commission within 30 days after* issuance of the tentative order to determine if the proposed rate increase is just and reasonable.

   U.C.A., 1953, § 54–7–12(3)(d) (Repl.Vol. 6A, 1974, Supp.1985) (emphasis added).

casts of these unpredictable cost and revenue items in accelerated rate-making proceedings to be held every six months. The EBA nets the revenues anticipated from nontariff sources and surplus energy sales and the expenses expected to be incurred as a result of purchased energy and fuel costs. The "EBA rate" then is added to the base rate in calculating total charges to a utility's customers.

Revenues derived from the EBA component of a consumer's utility bill are segregated and held in the energy balancing account. If the EBA rate has been set too low and the energy balancing account shows a deficit, at the next EBA rate proceeding the utility will seek an increase in the rate. On the other hand, if the EBA shows a surplus, the EBA rate will be adjusted downward at the next proceeding. *Report & Order* at 16, para. 33. Ideally, over the long term the account is zeroed out, *i.e.*, the revenues flowing into the account will equal the expenditures charged to it. Thus, the EBA accomplishes the purpose of the pass-through legislation to allow expeditious rate response to those elements of cost which are subject to frequent fluctuation, and it does so without bypassing the more formal requirements of general rate making. *See* U.C.A., 1953, § 54–7–12 (Repl.Vol. 6A, 1974, Supp.1985).

With this background in mind, we consider the instant case. The Department of Business Regulation challenges the PSC's orders allowing UP & L to divert money accumulated in its EBA into its coffers to make up for an unexpected shortfall in general revenues. The facts leading up to the transfer are as follows: In 1982, UP & L's tariff sales revenues were $40 million short of projections because of decreases in general consumer demand for energy. This slack in demand meant that UP & L had idle generating capacity, the fixed costs of which were borne by the compa-

ny's shareholders. To minimize the resulting loss, UP & L aggressively sought nontariff customers for energy that could be generated from these idle facilities, and it managed to make sales totaling $18 million. This $18 million was placed in the utility's energy balancing account, rather than its general revenue account, because it was revenue produced from nontariff sales.

Due to the $40 million shortfall in revenues from tariff customers in 1982, UP & L's shareholders stood to receive a return on equity of only 13.25 percent, compared to the 16.3 percent authorized by the PSC in the last general rate-making proceeding. Therefore, UP & L petitioned the PSC to make an "accounting adjustment" which would allow it to transfer $6 million of the $18 million nontariff revenues out of the EBA into its general revenue account. UP & L argued that the diversion was a fair split of nontariff revenues between ratepayers and the company, but it provided no evidentiary support for its claim that this division of revenues was fair to both consumers and to UP & L.

Relying upon its general authority to supervise the business of a public utility under section 54–4–1 of the Code,[2] the PSC allowed what it termed an "accounting adjustment," finding that a one-time diversion of funds was justified because of unusual circumstances, those being a deterioration of company earnings and UP & L's aggressive marketing which generated the revenues, and because the PSC had previously allowed another utility a similar adjustment in another case.[3] *Order*, Case No. 82–035–14 (December 30, 1982), *aff'd on rehearing, Order on Rehearing*, Case No. 82–035–14 (July 5, 1983).

Before this Court, the Department of Business Regulation asserts that the PSC's decision has effectively increased utility rates for consumers and constitutes retro-

---

**2.** U.C.A., 1953, § 54–4–1 (Repl.Vol. 6A, 1974, Supp.1985).

**3.** Neither the facts nor the opinion in *Application of Mountain Fuel Supply to Adjust Base Rate for Natural Gas Service in Utah*, Case No. 81–057–19, cited by the PSC as precedent for

this action, are in the record, and that case apparently was not appealed to this Court. Therefore, we are unable to determine if there were similar circumstances or if, in fact, an identical diversion of funds was allowed.

active rate making, in violation of sections 54–4–4 and 54–7–12 of the Code. The Department asserts that overall rates charged to consumers are higher than they otherwise would have been because if the diverted funds had been retained in the EBA, the PSC in its EBA rate-making decision of October 31, 1983, would have set the EBA rate even lower than it did. *See Order*, Case No. 83–035–04 (July 1, 1983). The Department argues that the order in Case No. 82–035–1 (December 30, 1982) constitutes retroactive rate making because it permits UP & L to take revenues collected as part of the EBA rate and to pay them to shareholders based solely on unexpectedly poor performance.

UP & L argues that the PSC's action was merely an "accounting adjustment" which does not constitute retroactive rate making. UP & L contends that the ratepayers reap a windfall by having nontariff sales included in the EBA. It claims this is patently unfair because the company incurs fixed costs even when generating facilities are idled, and the revenues from nontariff sales should be available to mitigate those costs. Finally, as an alternative argument, UP & L asserts that to the extent that nontariff revenues in the EBA are restricted to offsetting increased energy and fuel costs, the EBA is invalid in its entirety.

We will overturn the PSC's order only if there is no substantial evidence supporting the PSC's findings, if the PSC acted in excess of its statutory authority, or if the order violated a statutory or constitutional right of the parties. *See, e.g., Department of Business Regulation v. Public Service Commission*, Utah, 614 P.2d 1242, 1250 (1980); *Jeremy Fuel & Grain Co. v. Public Utilities Commission*, 63 Utah 392, 348 and 400, 226 P. 456 (1924). We conclude that the PSC exceeded its statutory authority here because its order effectively allowed UP & L to tap the EBA to make up for a general revenue shortfall, thus violating the proscription against retroactive rate making.

The PSC has broad authority to regulate a utility's business. U.C.A., 1953, § 54–4–1 (Repl.Vol. 6A, 1974, Supp.1985). That authority, however, must be construed to harmonize with the general rules for rate making set by the legislature, to wit: all rate making must be prospective in effect and rates may be fixed only in general rate proceedings. U.C.A., 1953, § 54–4–4(1) and § 54–7–12(1)–(2) (Repl.Vol. 6A, 1974, Supp. 1985). It is true that the PSC has limited authority to permit interim rate changes which are necessary because of unexpected increases in certain specific types of costs; such authority is specifically given in the fuel cost pass-through legislation. U.C.A., 1953, § 54–7–12(3)(d) (Repl.Vol. 6A, 1974, Supp.1985). However, neither the pass-through legislation nor the Commission's general grant of regulatory authority permits a utility to have retroactive revenue adjustments in order to guarantee shareholders the rate of return initially anticipated.

The PSC's reliance on the pass-through statute to justify its order is misplaced.[4] Nothing in the pass-through statute allows the revenues which are specifically collected to cover anticipated fuel costs to be used

---

**4.** The PSC attempts to find statutory support for the EBA by arguing that it was instituted in an attempt to implement the fuel cost pass-through legislation. It is hard to understand how this advances the PSC's case here. But, in any event, that suggestion seems farfetched. There is nothing in the pass-through legislation that sanctions the establishment of an EBA. The pass-through legislation's purpose is quite limited: it permits utilities to cover excessive fuel costs which could not be otherwise accurately forecast by allowing those costs to be immediately passed through to consumers via abbreviated proceedings. U.C.A., 1953, § 54–7–12(3)(d) (Repl.Vol. 6A, 1974, Supp.1985). The EBA, on the other hand, takes into account revenue items as well—something well outside the purposes of the pass-through legislation. The only relation that we can discern between the pass-through legislation and the EBA is that in between general rate-making proceedings the PSC uses pass-through proceedings to adjust the fuel cost component of the EBA. We find no authorization for the establishment of EBA's in the pass-through legislation; rather, we assume that the EBA order was promulgated under the Commission's ample general power to fix rates and establish accounting procedures. U.C.A., 1953, § 54–7–1 (Repl.Vol. 6A, 1974, Supp.1985).

to make up for general revenue shortfalls. Likewise, nothing in the pass-through statute permits retroactive rate adjustments to be made to cover unexpected increases in fuel costs, even if the revenue so generated is used to cover shortfalls attributable only to the fuel cost increment of the utility's rate. The pass-through legislation is very limited: it simply provides an expedited procedure whereby the PSC may permit utilities to quickly impose *prospective* rate increases to cover increased fuel costs.

We have previously held that a utility's attempt to use procedures established in the fuel cost pass-through statute to recover specific nonfuel-related expenses is invalid. *See Utah Department of Business Regulation*, 614 P.2d at 1248–49. The decision in this case extends that holding to prohibit the use of the pass-through statute to enable a utility to recover revenue shortfalls resulting from errors in forecasting or calculating an appropriate general rate. The pass-through statute has not modified the risk relationship that exists between a utility and its customers by reason of the requirement of prospective rate making. The utility cannot use the energy cost pass-through procedure to shift to ratepayers the risk of misprojecting nonenergy components of the general rate. Our holding is consistent with those of other courts that have considered fuel cost adjustment statutes and have determined that such statutes cannot be used to guarantee that a utility will actually earn its authorized rate of return. *See, e.g., Southern California Edison Co.*, 576 P.2d at 945.

UP & L argues very offhandedly that we should find the EBA invalid because it takes nontariff sales and allocates them to the benefit of ratepayers. That issue was not the focus of any presentation before the Commission or this Court. We decline to determine the overall validity of the PSC's order establishing the EBA and the propriety of the PSC's determination that certain costs and revenues (including revenues from nontariff sales) should be segregated from a utility's general account and held in the EBA. These issues were not raised below, and the information before this Court is inadequate to permit their reasoned determination.

Even if we did address the issues raised by UP & L, it would not affect our holding. It is of no import that the nontariff revenue, which flowed into the EBA rather than into general revenues, might be available to UP & L if the EBA did not exist or were structured differently. In determining the validity of the order here under review, the fact that the PSC's motive was to correct some untoward effects of a faultily constructed EBA would be irrelevant. The bar on retroactive rate making has no exception for missteps made in the rate-making process. Corrective action can be taken, but it must be prospective only. *See* U.C.A., 1953, § 54–4–4 and § 54–7–12 (Repl.Vol. 6A, 1974, Supp.1985). The narrow issue before us is whether the PSC's actions amounted to retroactive rate making. Any other issues, including those discussed by Justice Stewart, must be resolved in another case properly raising them.

The orders of the PSC are reversed.

HALL, C.J., and DURHAM, J., concur.

STEWART, Justice (dissenting):

The Commission's order did not retroactively change the rates paid for electricity. What the order apparently did was to adjust the Energy Balancing Account (EBA) so that additional nontariff revenues are attributable to the company, rather than the ratepayers. Whether that "accounting adjustment," as Utah Power and Light (UP & L) calls it, constitutes retroactive rate-making is not clear to me on the facts of this case because the Commission's findings simply do not explain how the EBA operates, especially with respect to the inclusion in that account of jurisdictional and nonjurisdictional revenues, rather than just fuel costs. Furthermore, I think the concept of retroactive rate-making is more complicated than the majority opinion indicates, and might not apply in this case. Since the Commission's findings of fact and conclusions of law fail to explain adequate-

ly the reasons for its action and the actual manner of operation of the EBA, I am not able to reach a conclusion as to whether the adjustment was illegal. The difficulty is highlighted by UP & L's suggestion that the Commission's order establishing the EBA is unlawful. Since UP & L did not appeal that order when it was entered, did not raise the issue on a cross-appeal in the instant case, and has not really briefed it, the issue cannot now be raised. But the EBA does appear to have produced distortions in the company's accounting procedures. Whether those distortions favor the company or the ratepayer in the long run is simply not dealt with in the findings.

I would remand the case to the Commission for additional findings.

HOWE, J., concurs in the dissenting opinion of STEWART, J.