MCI TELECOMMUNICATIONS CORP., Petitioner,

v.

PUBLIC SERVICE COMMISSION OF UTAH, Brian T. Stewart, Chairman, James M. Byrne, Commissioner, Respondents.

TEL–AMERICA OF SALT LAKE CITY, INC., Petitioner,

v.

PUBLIC SERVICE COMMISSION OF UTAH, Brent H. Cameron, Commissioner, James M. Byrne, Commissioner, Brian T. Stewart, Chairman, Respondents.

Nos. 890251, 890252.

Supreme Court of Utah.

May 12, 1992.

Rehearing Denied June 8, 1992.

Gregory B. Monson, C. Scott Brown, Salt Lake City, for Mountain States Telephone.

Ted D. Smith, Salt Lake City, for U.S. West Communications.

David L. Stott, Laurie L. Noda, Salt Lake City, for Public Service Com'n.

Randy L. Dryer, Jim Butler, Salt Lake City, for MCI Telecommunications.

Thomas M. Zarr, Stanley K. Stoll, Daniel D. Hill, Salt Lake City, for Tel–America.

Michael L. Ginsberg, Salt Lake City, for Division of Public Utilities.

STEWART, Justice:

In 1985, the Public Service Commission (Commission) granted Mountain States Telephone and Telegraph Co., now U.S. West Corp. (U.S. West),[1] a $22 million general rate increase and established 14.2% as its authorized rate of return on equity. In granting the increase, the Commission assumed that U.S. West would pay a federal corporate income tax of 46%, the then-existing rate.

On October 22, 1986, Congress enacted the Tax Reform Act of 1986 (Act), which provided a two-step reduction in the federal corporate income tax rate, from 46% to 40% effective June 1987, and then to 34% effective January 1988. This amounted to a total reduction of approximately 26%.

In December 1986, the Commission requested that the major utilities in the state provide it with information showing the anticipated effect of the reduced income tax rates on their earnings. The president of U.S. West responded that although the initial impact on cash flow would be negative, "the tax law is a critical factor in averting rate requests." He further stated, "Considering all of the data, I feel very good about the possibility of rate stability for our customers over the next few years. The benefits of the 1986 Tax Reform Act will go to ratepayers since they work to offset intrastate increases in our continuously changing industry." In January 1987, the Commission requested that the Utah Division of Public Utilities (Division) review the responses of the companies. The Division recommended that the Commission not order U.S. West to reduce its rates. The Commission then directed the Division to undertake a formal investigation of U.S. West's rate of return.

The Committee of Consumer Services (Committee) was created by the Legislature to serve as "advocate ... of positions most advantageous to a majority of residential consumers." Utah Code Ann. § 54–10–4(3) (1990). On June 1, 1987, the Committee filed a motion with the Commission asking it to declare the rates of all public utilities subject to the Commission's jurisdiction to be interim rates or, alternatively, to require them to establish refund reserve accounts from which excess earnings could be refunded to ratepayers. The Commission denied the motion on June 30, 1987, referring in part to the Division's report that U.S. West's rate of return for 1986 and 1987 would be less than 13% and 12% respectively, less than its authorized rate of 14.2%.

1. Mountain Bell became U.S. West Corp. in 1988. We will use the name "U.S. West" throughout this opinion for ease of reference.

The Division represented that the net effect of the Act on U.S. West's earnings would be an increase of $1.2 million in 1987 and $0.5 million in 1988. The Division also reported that it was monitoring U.S. West's earnings on a monthly basis and would alert the Commission to any significant changes.

By August 1987, utility regulators in forty-three states and the District of Columbia had taken some action to reduce utility rates in response to the Act.

On August 11, 1987, the Committee requested that U.S. West disclose its earnings. U.S. West objected on the ground that the Division was already monitoring its earnings. The Committee then moved to compel U.S. West to respond to the request for data. The Commission ruled in November 1987 that the motion to compel would be held in abeyance pending completion of the Division's investigation, but that in the meantime the Division should give the Committee the financial information it had obtained from U.S. West.

On September 1, 1987, the Division filed a second report with the Commission indicating that U.S. West's rate of return remained below its 14.2% authorized rate of return. Again, the Division recommended that the Commission take no action.

The Division's conclusions appear to have been seriously in error. U.S. West's actual rate return had exceeded its authorized rate of return in six of the first eight months of 1987, even though the first phase of the federal tax reduction was not effective until June 1987. Data furnished by U.S. West to MCI Telecommunications Corporation in September 1988 in response to interrogatories provided the following monthly breakdown for U.S. West's return on equity for its Utah intrastate operations:

| Month | 1987 | 1988 |
|---|---|---|
| January | 12.02% | 17.23% |
| February | 15.14% | 15.62% |
| March | 3.52% | 22.04% |
| April | 15.00% | 16.23% |
| May | 16.62% | 12.29% |
| June | 17.86% | 16.02% |
| July | 16.24% | |
| August | 25.31% | |
| September | 20.76% | |
| October | 17.24% | |
| November | 19.89% | |
| December | 24.48% | |

As is evident from these figures, U.S. West's rate of return increased dramatically after the first phase of the tax reduction became effective. For the last six months of 1987, U.S. West's average monthly rate of return on equity was over 20%.

In December 1987, the Division and U.S. West privately negotiated a $9 million reduction in future rates to be effective January 1, 1988. The Commission approved the stipulation without a hearing or findings of fact to justify the amount of reduction and without disclosing what U.S. West's earnings had been in 1987, what they would likely be in 1988, or by how much they exceeded the authorized rate of return.

Subsequent events disclosed that the $9 million reduction was inadequate to reduce U.S. West's earnings to its authorized rate of return. U.S. West's high rate of earnings continued for the first six months of 1988. During that period, its average monthly earnings were in excess of a 16% rate of return, even with the January 1987 rate reduction. Thus, U.S. West's earnings significantly exceeded its authorized rate of return for each of the twelve months following the effective date of the *first* phase of the tax reductions under the Act.

On January 28, 1988, the Committee requested that U.S. West produce the financial data on which the $9 million rate reduc-

tion was negotiated. This request was made after the *second* phase of the tax reduction became effective. U.S. West responded that it considered the investigation closed and refused to disclose the data. The Committee then hired an independent consulting firm to review both the settlement and U.S. West's earnings. In May 1988, the firm issued a report asserting that the $9 million stipulated rate reduction was "clearly inadequate."

In July 1988, the Commission initiated a general rate case, docket No. 88–049–07, to investigate the reasonableness of U.S. West's rates and earnings. Again the Commission denied the Committee's request to declare U.S. West's rates interim rates. Instead, the Commission ruled that if U.S. West's earnings were in excess of its authorized rate of return, they would be subject to a rebuttable presumption that they were unjust and unreasonable and subject to refund. In August 1988, the Division, the Committee, and U.S. West stipulated to a further rate reduction of $31 million, a $20 million reduction to be effective September 1, 1988, and an $11 million reduction to be effective January 1, 1989.

On September 22, 1988, the Commission, with no findings of fact, rejected the stipulated reduction and ordered an interim rate reduction of only $27 million, $16 million of which would be effective August 1, 1988, and $11 million of which would be effective January 1, 1989.

Then, in October 1988, the Commission, at U.S. West's request, vacated its September 22 order reducing rates by $27 million—again with no findings of fact—and instead approved a stipulation for a permanent reduction of $26 million, $16 million to be effective September 22, 1988, and $10 million to be effective January 1, 1989. The Commission, also at U.S. West's request, vacated its August 2 order declaring that earnings in excess of U.S. West's authorized rate of return were presumptively unjust and unreasonable and subject to refund. In addition, the parties agreed that there would be no further demands for interim rate decreases pending the conclu-

sion of the general rate case, and the Commission approved the agreement, again without findings.

Finally, one year later, in October 1989, after formal hearings and extensive findings of fact and conclusions of law, the Commission entered still another rate reduction order of almost $22 million to be effective November 15, 1989.

Thus, over a period of approximately two years, the Commission entered three orders reducing U.S. West's rates in a four-step process by a total of $57 million. The reductions were apparently due, at least in part, to the fact that the Tax Reform Act had decreased U.S. West's federal tax liability, thereby increasing its earnings to a level significantly in excess of its authorized rate of return.

While the Commission was considering the stipulation on which the October 1988 rate reduction was based, David Irvine, a U.S. West ratepayer and former PSC Commissioner, filed a request for agency action, asking the Commission to (1) investigate U.S. West's rate of return for the years 1987 and 1988, and (2) order U.S. West to refund to the ratepayers all earnings exceeding the 14.2% authorized rate of return. The Commission subsequently granted MCI Telecommunications Corp. (MCI), Tel–America of Salt Lake City, Inc. (Tel–America), and other interested parties, including a number of members of the Utah Legislature, leave to join in the request.

The Commission severed the request for agency action from the general rate case and assigned the request for agency action docket No. 88–049–18. The Commission denied the relief sought by the request. Although the Commission found that U.S. West's earnings had exceeded its authorized rate of return for the period in question, it did not state by how much. It did state, however, that the Tax Reform Act was a cause of the overearnings. The Commission ruled that it had no authority to order a refund because a refund would constitute retroactive rate making in violation of Utah Code Ann. § 54–4–4(1) and *Utah Department of Business Regulation*

*v. Public Service Commission*, 720 P.2d 420 (Utah 1986).

## I. STANDARD OF REVIEW

■ The Utah Administrative Procedures Act (UAPA), Utah Code Ann. §§ 63–46b–1 to –22 (1989), establishes the appropriate standards of review. UAPA applies to all agency adjudicative proceedings commenced on or after January 1, 1988. *Id.* § 63–46b–22(1).

■ The primary issues to be resolved are whether the Commission erred in (1) ruling that there is no applicable exception to the rule against retroactive rate making for unforeseeable and extraordinary events, and (2) ruling that there was no basis for a factual inquiry into whether U.S. West engaged in misconduct by presenting misleading information on actual and projected earnings or by improperly avoiding disclosure of its earnings. Both issues are questions of law, subject to de novo review. Utah Code Ann. § 63–46b–16(4)(d); *Mountain States Tel. & Tel. Co. v. Public Service Comm'n*, 754 P.2d 928, 930 (Utah 1988).

## II. EXCEPTIONS TO THE PROHIBITION AGAINST RETROACTIVE RATE MAKING

■ As a general proposition, a utility's recoupment of costs that were greater than projected or revenues that were less than projected from future rates constitutes retroactive rate making. The leading case in this jurisdiction prohibiting retroactive rate making is *Utah Department of Business Regulation v. Public Service Commission*, 720 P.2d 420 (Utah 1986) [hereinafter *EBA* ]. Utah Power & Light Co. had established an energy balancing account (eba account), an accounting device created to facilitate interim rate increases to compensate for rapidly escalating fuel costs. Utah Power transferred greater than expected revenues that had accrued in the eba account to general revenues. The purpose of the transfer was to benefit the stockholders. If left in the eba account, the increased revenues would have benefited the ratepayers. Utah Power argued that the transfer was an accounting adjustment, not retroactive rate making, that the ratepayers would reap a windfall if the unexpected revenues remained in the eba account, and that, even with the transfer, Utah Power shareholders would receive a lower return on equity (13.25%) than the authorized rate (16.3%).

The Court held that Utah Power could not transfer the unanticipated increased revenues out of the eba account to benefit the stockholders. The Court stated that in a general rate proceeding utility rates are fixed on the basis of projected costs and revenues for a future "test" year. Although the Legislature had specifically authorized interim rate increases to adjust for rapidly increasing fuel costs in a bob-tailed rate proceeding, the Court held that the utility could not recoup lost earnings caused by costs greater than projected or by revenues less than projected in the prior rate case. The Court reasoned that "neither the pass-through legislation nor the Commission's general grant of regulatory authority permits a utility to have retroactive revenue adjustments in order to guarantee shareholders the rate of return initially anticipated." *EBA*, 720 P.2d at 423.

The Court explained that the prohibition against retroactive rate making is designed to provide utilities with an incentive to operate efficiently. For that reason, utilities are not allowed to recoup unanticipated costs or unrealized revenues.

> This process places both the utility and the consumers at risk that the rate-making procedures have not accurately predicted costs and revenues. If the utility underestimates its costs or overestimates revenues, the utility makes less money. By the same token, if a utility's revenues exceed expectations or if costs are below predictions, the utility keeps the excess. Overestimates and underestimates are then taken into account at the next general rate proceeding in an attempt to arrive at a just and reasonable future rate.

*EBA*, 720 P.2d at 420–21 (citations omitted). Therefore, "[t]he bar on retroactive

rate making makes no exception for missteps in the rate-making process," even though the projections of expenses and revenues for the test year will necessarily vary from actual experience. *Id.* at 424.

### A. *Exception For Extraordinary and Unforeseeable Expenses or Revenues*

MCI and Tel–America acknowledge the general rule against retroactive rate making, but argue that the instant case falls within an exception that applies when an unforeseeable event results in an extraordinary increase or decrease in expenses or revenues.

A number of courts have recognized the exception for unforeseeable and extraordinary increases in a utility's expenses. Increased expenses from natural disasters, such as extreme weather conditions, and other extraordinary events are the typical bases for the exception. *See, e.g., Office of Consumer Advocate v. Iowa State Commerce Comm'n,* 428 N.W.2d 302, 306–07 (Iowa 1988) (one-time assessment for permanent storage of nuclear waste under Nuclear Waste Act of 1982 was extraordinary, unforeseeable expense); *Narragansett Elec. Co. v. Burke,* 415 A.2d 177, 178–80 (R.I.1980) (extraordinary ice storm); *In re Green Mountain Power Corp.,* 519 A.2d 595, 597–99 (Vt.1986) (unscheduled shutdown of nuclear plant extraordinary expense); *Wisconsin's Environmental Decade, Inc. v. Public Serv. Comm'n,* 98 Wis.2d 682, 298 N.W.2d 205, 212 (Ct.App. 1980) (severe ice storm); *Re Kansas City Power & Light Co.,* 75 Pub.Util.Rep. 4th (PUR) 1, 38–41 (Mo.Pub.Serv.Comm.1986) (severe ice storm); *Re Kansas City Power & Light Co.,* 55 Pub.Util.Rep. 4th (PUR) 468, 480–81 (Mo.Pub.Serv.Comm.1983) (power outage caused by interruption of water supply to boiler). In *Green Mountain Power,* the Vermont Supreme Court explained the rationale for the exception:

"If this treatment is not to be permitted, not only would there be a serious question as to whether the Company has been afforded a fair opportunity to earn a reasonable rate of return, it would also imply the need for an upward revision of the rate of return in *all* cases in the future. Such a revision, of course, would have to be based on a prediction of inherently unpredictable events—the occurrence of extraordinary plant shutdowns."

The Board's conclusion was correct. Once it is clear that a particular cost is "extraordinary" and that it does not result from company mismanagement, or imperfect forecasts, treatment of such costs through appropriate amortization in future rate determinations does not constitute a "true-up" of past calculations, because a truly extraordinary cost by definition would not be factored into the original rate.

*Green Mountain Power,* 519 A.2d at 597 (citations omitted) (emphasis in original) (quoting Order of Vermont Public Service Board); *accord Burke,* 415 A.2d at 178–79.

The exception has been applied not only to unforeseeable and extraordinary increases in expenses, but also to unforeseeable and extraordinary decreases in expenses. *See, e.g., Re Narragansett Elec. Co.,* 57 Pub.Util.Rep. 4th (PUR) 549, 558 (R.I.Pub. Utils.Comm.1984) (excess earnings due to "unanticipated economic recovery and unforeseeable weather"); *see also Chesapeake and Potomac Tel. Co. v. Public Serv. Comm'n,* 514 A.2d 1159, 1170 (D.C. 1986) (reimbursement of license contract payments previously paid to AT & T); *Turpen v. Oklahoma Corp. Comm'n,* 769 P.2d 1309, 1332 (Okla.1988) (AT & T's reimbursement to subject utility was unexpected windfall).

The extraordinary and unforeseeable nature of the expenses recognized under the exception differentiates them from expenses inaccurately estimated because of a misstep in the rate-making process, such as the inability to predict precisely, or from mismanagement. An increase or decrease in expenses that is unforeseeable at the time of a rate-making proceeding cannot, by hypothesis, be taken into account in fixing just and reasonable rates. Furthermore, because the increase or decrease must have an extraordinary effect on the utility's earnings, the increase or decrease

772

will necessarily be outside the normal range of variance that occurs in projecting future expenses.

If a rate-making body were to attempt to make allowance for an unforeseeable and extraordinary increase or decrease in expenses in fixing rates, a task that by definition is impossible, the resulting rates would always be unjust and unreasonable, if not confiscatory or exploitive, as to either ratepayers or stockholders. To achieve fairness, the exception allows recoupment of such expenses either in future rates or in some other appropriate fashion.

 The rule stated in the *EBA* case is a sound rate-making principle, but it only applies to "missteps in the rate-making process." It does not apply where justice and equity require that adjustments be made for unforeseen windfalls or disasters not caused by the utility. We emphasize that the exception for unforeseeable and extraordinary events cannot be invoked simply because a utility experiences expenses that are greater or revenues that are less than those projected in the general rate proceeding.

 In the instant case, the Commission held that the rule against retroactive rate making barred any relief sought by the request for agency action and that no exception to the rule was applicable. The Commission did not specifically state, however, whether there was an exception for unforeseeable and extraordinary expenses. We now hold that the exception for unforeseeable and extraordinary increases or decreases in expenses is recognized in this state.

 We also hold that the Commission's refusal to allow petitioners a factual hearing on whether the exception applies was error. The extent of the reduction of corporate income tax rates under the Act was clearly unforeseeable when the last general rate case was decided in 1985. Ordinarily, changes in tax laws are not a sufficient basis for invoking the exception to the general rule. Here, however, the federal corporate income tax rate was cut by more than one-fourth. As the United

States Court of Appeals for the District of Columbia Circuit commented in connection with the Act, "The change in [Carolina Power & Light Company's] tax costs at issue here was caused by an act of Congress (one only marginally more foreseeable than an act of God)." *Carolina Power & Light Co. v. FERC,* 860 F.2d 1097, 1102 (D.C.Cir.1988).

U.S. West, the Division, and the Commission argue that the Act was foreseeable and that "the Commission and the Division foresaw the potential impact of the [Act] and acted responsibly in attempting to deal with it." The Commission, however, did not foresee the Tax Reform Act in the general rate case in 1985. In fact, that case assumed a federal tax rate of 46%.

Moreover, it appears that the Commission seriously misappraised the effect of the Act after it was enacted, as evidenced by the gross inadequacy of the 1987 rate reduction. There is even doubt that the Commission accurately foresaw the effect of the Act in 1988 when it agreed to a $26 million rate reduction, and only a few months later, to another $20 million reduction. Even if we agreed with the Commission that it foresaw the effect of the tax reduction and took action to remedy it in 1987, it is clear that the Commission did not understand the full effect of the Act with sufficient clarity to remedy U.S. West's overearnings. Whether that failure was a result of U.S. West's failure to disclose relevant financial data and projections promptly should be explored on remand.

Not only did the Commission fail to foresee the effect of the Act, but there is significant evidence, at least on this record, that the Act provided an extraordinary decrease in U.S. West's expenses and a corresponding extraordinary increase in earnings.

Furthermore, whether the Commission and the Division acted responsibly in attempting to deal with the effects of the Act, as the Commission asserted, is problematic. The Commission's procedural handling of U.S. West's excessive earnings in the 1987 and 1988 rate reductions was irregular, if not illegal. The only explana-

tion given by the Commission for the 1987 and 1988 rate reductions is found in its order denying the amended request for agency action, where the Commission stated that U.S. West "earn[ed] in excess of its authorized rate of return in calendar years 1987 and 1988," and the only explanation the Commission has given for the overearnings is, "One of the reasons for the overearning was the impact upon U.S. West of the Tax Reform Act of 1986." These explanations are clearly inadequate. The Commission has never indicated what U.S. West's actual earnings and rate of return were for the years in question, by how much its actual rate of return exceeded the authorized rate of return, what rate of return the 1987 and 1988 rate reductions were intended to produce, why the reductions were stretched out over three steps, whether the reductions were intended to reduce U.S. West's earnings to the level authorized in the December 1985 general rate case or to some other level, or whether the Commission allowed U.S. West to offset the decrease in taxes by increases in other expense items not associated with the Act.

The Commission sought to explain its delayed response to U.S. West's overearnings by stating that the Division initially indicated that its analysis of U.S. West's financial data would reveal off-sets to the income tax reduction and it suggested no need for Commission action. The Commission stated, "[T]he Division made a good faith effort to accurately and correctly analyze the information provided to it by the utility." That finding begs the question whether U.S. West promptly disclosed sufficiently specific and accurate financial information, a question the Commission has not addressed.

■ Moreover, the fixing of utility rates by private negotiation with no findings of fact raises serious questions about the legality and integrity of the procedures the Commission employed. The Commission serves a crucial role in protecting ratepayers from overreaching by entities with monopoly power that provide essential services. We have on many occasions empha-

sized that the Commission must make appropriate findings of fact to justify rate orders. In *Utah Department of Business Regulation v. Public Service Commission*, 614 P.2d 1242, 1245 (Utah 1980), we stated that the first prerequisite of a rate order is that it be preceded by a hearing and findings. We explained:

A state regulatory commission, whose powers have been invoked to fix a reasonable rate, is entitled to know and before it can act advisedly must be informed of all relevant facts. Otherwise, the hands of the regulatory body could be tied in such fashion it could not effectively determine whether a proposed rate was justified.

*Id.* at 1246. Although *Department of Business Regulation* dealt with an effort to increase rates, the same principle applies here, where the Commission acted to decrease rates. In that case, we emphasized the importance of adherence to proper procedures and specifically condemned procedures of the type employed here:

In summary, there is no provision in the Public Utilities Act which precludes the authority of the P.S.C. to conduct an abbreviated proceeding to adjust a utility rate or charge, but any rate so adjusted must be predicated upon a finding that such adjusted rate is just and reasonable. In turn, this finding must be supported by substantial evidence concerning every significant element in the rate making components (expense or investment) which is claimed by the applicant as the basis to justify a rate adjustment.

*Id.* at 1249–50.

Similarly, In *Milne Truck Lines, Inc. v. Public Service Commission*, 720 P.2d 1373, 1378 (Utah 1986), we stated that the Commission cannot discharge its statutory responsibilities without making findings on both ultimate and subordinate issues of fact. Once again, we emphasized that the Commission's regulation of public monopolies must strictly adhere to those procedures designed to give appropriate protection to the interests of ratepayers, investors, the utilities themselves, and where they exist, competitors. *Id.* Moreover, un-

less the Commission complies with those procedures, this Court cannot perform its assigned task of judicial review. *Id.; Mountain States Legal Found. v. Utah Public Serv. Comm'n*, 636 P.2d 1047, 1058 (Utah 1981).

■■■ Here, the Commission issued two orders that reduced U.S. West's rates by a total of $35 million with no findings of fact on either subordinate or ultimate factual issues pertaining to the reasonableness of the reduction or to the reasonableness of the rates that went into effect after the reduction. Given the sequence of the Commission's orders and rate reductions, it seems highly likely that the first two reductions were not sufficient to offset the effect of the reduced income tax rate. In any event, it appears that by reducing the rates in a three-step manner the Commission allowed U.S. West to collect excessive rates and earnings, at least until all the reductions finally went into effect.

On remand, the Commission should make factual findings on all relevant issues. Its findings must, at a minimum, include (1) U.S. West's earnings and rate of return for the years 1986, 1987, 1988, and 1989 and the earnings and profits that would have been realized but for the stipulated rate reductions in 1987 and 1988; (2) the extent to which U.S. West's earnings exceeded the authorized rate of return in 1987, 1988, and 1989, both with and without the stipulated rate reductions; (3) the amount of the decrease in U.S. West's federal corporate income tax liabilities for the years 1987, 1988, and 1989 as a result of the decrease in the federal tax rates compared with what U.S. West's tax liabilities would have been under the federal corporate income tax rates in effect in December 1985; (4) the amount, if any, of increased expenses or decreased revenues that were offset against U.S. West's tax savings in negotiating the 1987 and 1988 rate reductions and

whether they should have been allowed under the *EBA* case to "true up" past projections; and (5) whether U.S. West was cooperative, accurate, and forthright in the information provided and representations made to the Committee, the Division, and the Commission, including its initial representation by the president of U.S. West as to the expected effect of the Act.

### B. *Utility Misconduct as an Exception to the Rule Against Retroactive Rate Making*

Petitioners also argue that the rule against retroactive rate making does not bar a refund of earnings obtained as a result of utility misconduct and that the Commission acted arbitrarily and capriciously in not holding a hearing on whether U.S. West was guilty of misconduct in not providing timely, accurate, and specific information as to its actual or projected earnings for 1987 and 1988.

■■■ Before addressing the substantive issues, we address a procedural question. The Commission, the Division, and U.S. West argue that petitioners failed to raise in their petitions for rehearing the issue whether the Commission erred in failing to hold a factual hearing on the allegation that U.S. West engaged in misconduct. Under Utah Code Ann. § 54–7–15(2)(a) and (b), an issue must be presented to the Commission in a petition for rehearing to be raised on appeal.[2] *See Hi–Country Homeowners Ass'n v. Public Serv. Comm'n*, 779 P.2d 682, 683–84 (Utah 1989); *Williams v. Public Serv. Comm'n*, 754 P.2d 41, 46 (Utah 1988); *Utah Dep't of Business Regulation v. Public Serv. Comm'n*, 602 P.2d 696, 699 (Utah 1979).

In response to the petition for agency action, the Commission issued an order on November 1, 1988, which stated, "It is contemplated by the Commission that the par-

---

**2.** Section 54–7–15 states in part:
 (1) Before seeking judicial review of the commission's action, any party ... who is dissatisfied with an order of the commission shall meet the requirements of this section.
 (2) (a) After any order or decision has been made by the commission, any party to the action or proceeding ... may apply for rehearing of any matters determined in the action or proceeding.
 (b) No applicant may urge or rely on any ground not set forth in the application in an appeal to any court.

ties will address in their legal memoranda the threshold issue of whether the Commission has the legal authority to grant the relief requested...." Petitioners' memoranda accordingly focused on the legal issue whether the Commission had authority to grant any relief in light of the *EBA* case and not on the facts that might support any particular theory justifying relief. Neither side argued factual issues in that context. The Commission ruled, as a matter of law, that the rule against retroactive rate making governed and that there was no applicable exception to that rule. The Commission stated, "We would agree that certain exceptions to the rule are reasonable; for example, where it could be demonstrated that the utility had misrepresented important ratemaking information or otherwise misled regulators." The Commission concluded, however, that there was no factual basis for that exception, although the Commission had held no factual hearing on the issue and the parties were not allowed to focus specifically on the factual basis for the exception.

MCI's and Tel–America's petitions for rehearing stated that they were filed for and on behalf of all petitioners and all customers of U.S. West. They both asserted, inter alia, that the Commission erred in ruling that the rule against retroactive rate making barred any relief and that the Commission's order denying relief was arbitrary and capricious. We conclude that petitioners adequately raised the issue of utility misconduct and that the issue is properly before this Court.

 A utility that misleads or fails to disclose information pertinent to whether a rate-making proceeding should be initiated or to the proper resolution of such a proceeding cannot invoke the rule against retroactive rate making to avoid refunding rates improperly collected. The rule against retroactive rate making was not intended to permit a utility to subvert the integrity of rate-making proceedings. *See Southwest Gas Corp. v. Public Serv. Comm'n,* 86 Nev. 662, 474 P.2d 379, 383 (1970). If a utility misleads the Commission or the Division by withholding relevant

rate-making information, the rates fixed by the Commission cannot be based on reasonable projections of the utility's revenues and expenses. The rule against retroactive rate making was designed to ensure the integrity of the rate-making process, not to shelter a utility's improperly obtained revenues.

 Moreover, the Commission has the inherent power to reopen a rate order if a utility engages in misconduct. *In re Minnesota Pub. Util. Commission's Initiation of Summary Investigation,* 417 N.W.2d 274, 280–82 (Minn.Ct.App.1987); *see also State ex rel. Corbin v. Arizona Corp. Comm'n,* 143 Ariz. 219, 693 P.2d 362 (Ct.App.1984).

 The Commission stated that the Division's analysis of U.S. West's earnings was "complicated during the time period in question by changes in the U.S. West accounting system, delays in preparation of U.S. West's budget, swings in monthly earning reports, etc." That finding, however, does not address whether U.S. West acted forthrightly and made timely and accurate information available to the Division, the Commission, and the Committee so that each could accurately analyze U.S. West's actual and projected earnings. Significantly, the Commission's finding does not explain why the rate of return figures finally provided by U.S. West pursuant to MCI's interrogatories evaded disclosure for so long. The Commission's explanation is simply inadequate under the circumstances. In this regard, it is significant that the $9 million rate reduction negotiated by the Division and U.S. West and approved by the Commission was characterized by an independent consulting firm as "clearly inadequate." That characterization was substantiated, at least to some degree, by the subsequent $26 million stipulated rate reduction a mere ten months later.

We conclude that given the facts appearing on the record and the allegations made by MCI and Tel–America to the Commission, the Commission's failure to hold a factual hearing on the issue of utility misconduct was arbitrary and capricious. *See*

Utah Code Ann. § 63–46b–16(4)(h)(iv) (1989).

## III. REFUNDS AND REPARATIONS

■ U.S. West argues that petitioners have no remedy in the form of reparations under Utah Code Ann. § 54–7–20 because the availability of reparations is limited by § 54–4–4, which states that rates found to be just and reasonable under that section are to be "thereafter observed and in force." [3]

■ Section 54–4–4, however, does not preclude a remedy in this case. If the rates charged by U.S. West fall within an exception to the rule against retroactive rate making in this case, they are not just and reasonable.

■ Finally, petitioners argue that an authorized rate of return imposes an absolute legal ceiling on a utility's profits and that all profits in excess of that rate are refundable. As a general proposition, we disagree. An authorized rate of return is intended to be an estimate of the return on equity that investors would require before they would invest in the utility. The rate of return is neither a guarantee of nor a limit on profits. A utility should be rewarded for becoming more efficient through its own efforts. If the authorized rate of return were an absolute ceiling on profits, that objective would be subverted.

Nevertheless, if a utility earns profits in excess of its authorized rate of return because of an exception to the rule against retroactive rate making, the authorized rate is the best available measure of a fair return and earnings in excess of that rate are subject to refund. Accordingly, if on remand the Tax Reform Act of 1986 is found to have resulted in an unforeseeable and extraordinary decrease in expenses or if U.S. West is found to have engaged in misconduct, we hold that U.S. West's earnings, to the extent they exceeded its authorized rate of return established in the 1985 general rate case, should be refunded to U.S. West ratepayers. Any refund of excess earnings that might be appropriate, whether by way of reparations, refund, or credit against future rates, must not be solely for the named petitioners; all U.S. West's ratepayers are entitled to the benefit of any remedy the Commission finds to be appropriate.

Reversed and remanded.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

ZIMMERMAN, Justice (Concurring).

I join the majority opinion, but write only to make explicit what I consider the underlying concern of the majority.

Today, we inform the Commission that the *EBA* decision does not preclude a retroactive adjustment of rates where they are either too high or too low as a result of an extraordinary and unforeseeable circumstance. The *EBA* case still prohibits retroactive rate making to address missteps in the rate-setting process or the normally occurring unexpected events that may lower or raise rates of return over time. Like the majority, I am unsure that even the tax changes' very large impact on the utility's income warrants invocation of the "extraordinary and unforeseeable" exception to the ban on retroactive rate making. However, the Commission should at least consider the issue.

The profoundly troubling aspect of the matter before us is the inexplicable failure of the Division and the Commission to do their statutorily mandated jobs in the face

---

**3.** U.S. West relies on *American Salt Co. v. W.S. Hatch Co.,* 748 P.2d 1060 (Utah 1987), for the proposition that the Commission has no authority to grant reparations where a utility has charged rates that have been previously approved by the Commission. *American Salt* is inapposite. There, we held that the Commission was without authority to grant relief from a previously approved tariff rate because an application for a special commodity rate was not made prior to the hauling in question. Therefore, the Commission's order requiring American Salt to pay the tariff rate was not disturbed. The case stands for the proposition that in the motor common carrier context, the Commission may not grant relief from an approved tariff rate where an application for a special commodity rate is not made prior to the hauling. It does not stand for the general proposition U.S. West urges.

of overwhelming evidence that the utility had made, and unless the Commission took remedial measures solely within its authority would continue to make, profits far beyond those anticipated at the time of the proceeding which set the current utility rates charged consumers. At almost every turn, the conduct of the Commission and the Division raises serious questions about whether the regulatory authorities—which state law charges with seeing that utility rates provide a fair but not exorbitant rate of return—were shirking the duty imposed upon them by law to check profiteering by the utility. I realize that these are harsh words, but from the record before us, it is difficult to reach any other conclusion.

Today's decision provides the Commission with a tool to deal with truly extraordinary and unforeseeable circumstances that impact the profits of a utility. Our decision also attempts to ensure that the Commission does the public's business in the open and that it explains in detail the rationale for its actions. However, nothing we can do can guarantee a vigorous and effective regulation of monopolistic utilities. That responsibility rests with the Commission.