2005 UT App 91

**US MAGNESIUM, L.L.C., Petitioner,**

v.

**PUBLIC SERVICE COMMISSION and PacifiCorp, Respondent.**

No. 20040082–CA.

Court of Appeals of Utah.

March 3, 2005.

---

Gary A. Dodge and Kevin W. Bates, Hatch James & Dodge, Salt Lake City, for Petitioner.

Mark L. Shurtleff, Attorney General, Patricia E. Schmid, and Michael L. Ginsberg, Assistant Attorneys General, and Sander J. Mooy, Publi Service Commission, Salt Lake City, for Public Service Commission.

Edward A. Hunter Jr. and David L. Elmont, Stoel Rives LLP, Salt Lake City, for PacifiCorp.

Before Judges BENCH, JACKSON, and ORME.

## OPINION

JACKSON, Judge:

¶ 1 U.S. Magnesium, L.L.C. (U.S. Mag) seeks review of the Public Service Commission's (Commission) order setting a rate of $21 per megawatt hour (MWH) for electricity PacifiCorp provided to Magnesium Corporation of America (Mag Corp) for the period from January 1, 2002 to May 24, 2002. We affirm.

## BACKGROUND

¶ 2 Like automobile traffic, electricity service has rush hours. And, just as highways have a maximum capacity, there is a maximum amount of electricity that can be supplied at any given time. In its function as a transmitter, rather than a generator, of electricity, a utility is akin to a highway. In these daily, weekly, and annual "rush hours," i.e. peak demand periods, a utility bears a greater burden than at other times. The unamendable laws of economics tell us that when there is an increase in demand but no increase in supply, the price rises. This price increase is passed on from the electricity generators to the utility. Thus, the cost of electricity to a utility is greater during peak demand periods than at other times.

¶ 3 In response, utilities have different types of service. The most common form, "firm service," entitles a customer to receive electricity whenever the customer desires, even in peak times, subject only to conditions outside of the control of the utility. In contrast, "interruptible service" is the electricity service equivalent of flying stand-by. That is, the parties agree in advance that the electricity service will be interrupted during peak times. The right not to provide service during peak demand times significantly reduces a utility's costs, and accordingly, a

utility generally charges significantly less for interruptible service than for firm service.

¶ 4 In the late 1960s, Mag Corp began to produce magnesium from facilities (the facilities) in Tooele County. The processing of the metal requires a significant amount of electricity. To reduce its costs, Mag Corp asked PacifiCorp to provide interruptible service. Initially, PacifiCorp resisted Mag Corp's requested rates. Eventually, the parties took the matter to the Commission. In 1968, enamored with the prospective economic benefits of the facilities, the Commission directed PacifiCorp to provide interruptible service to Mag Corp at a discounted rate. Mag Corp's interruptible rate was to be about 60% lower than the rate for firm service. In accord with the Commission's order, Mag Corp and PacifiCorp entered a thirty-year contract for interruptible service in 1968.

¶ 5 The parties amended the contract eight times over a thirty-year span, but each amendment left Mag Corp with interruptible service at a rate about 60% lower than the market rate for firm service. The Commission approved each of these amended rates. In 1998, the Commission approved the final amendment to the contract. The Commission's order set the rate at $18 per MWH, scheduled the contract to terminate on December 31, 2001, and required the parties to file with the Commission 120 days in advance to extend the interruptible service agreement.

¶ 6 Shortly thereafter, Mag Corp and PacifiCorp began to negotiate a continued contract, but they never reached an agreement. Several months before the contract expired, Mag Corp sought protection in bankruptcy court. And two weeks before the contract expired, PacifiCorp applied with the Commission to set interim rates for Mag Corp. Because of the bankruptcy proceedings and PacifiCorp's delay in bringing the application, the Commission did not have hearings on PacifiCorp's application until February 2002.

¶ 7 In the hearings, Mag Corp argued that in the future it should be provided interruptible service at a rate of $21 per MWH. PacifiCorp asked the Commission to disassociate the interruptibility feature from the rate.

Under PacifiCorp's plan, instead of having a rate set in advance for interruptible service, PacifiCorp would charge Mag Corp the firm service rate but compensate it for interruptions at the market rate appropriate at that particular time. Following these hearings, the Commission adopted Mag Corp's proposal, which was much more consistent with the parties' historical practice, and ordered PacifiCorp to prospectively provide interruptible service at $21 per MWH.

¶ 8 But, between the contract's expiration and the Commission's order, PacifiCorp continued to provide electricity to the facilities, and the facilities continued to use the electricity. Thus, between January 1, 2002 and May 24, 2002 (the disputed period), Mag Corp and PacifiCorp transacted "business as usual" but had neither an explicit contract nor a Commission order setting then applicable prices. In June 2002, as a result of the bankruptcy proceeding, U.S. Mag purchased Mag Corp's facilities and contractual rights, thus succeeding to Mag Corp's interest in this dispute. The Commission again held hearings and, after the fact, set the rate for the disputed period at $21 per MWH, mirroring what Mag Corp had requested in February 2002 for its future rates.

## ISSUE AND STANDARD OF REVIEW

¶ 9 On appeal, U.S. Mag argues that the Commission's order, which set the $21 rate for the disputed period, constitutes retroactive rate making and that the previous rate of $18 per MWH should apply. We recognize that the Commission "may regulate utility rates" and that "the scope of [our] review is confined to determination of proper exercise of [the Commission's] powers." *Beaver County v. Qwest, Inc.*, 2001 UT 81,-¶ 12, 31 P.3d 1147; *see also Mountain States Tel. & Tel. v. Public Serv. Comm'n*, 107 Utah 502, 512–14, 155 P.2d 184, 189 (1945) (Wolfe, J., concurring). Nonetheless, whether the order constitutes retroactive rate making is a "question[ ] of law, subject to de novo review." *MCI Telecomms. Corp. v. Public Serv. Comm'n*, 840 P.2d 765, 770 (Utah 1992).

**168**

ANALYSIS

¶ 10 In reaching its conclusion that the $21 rate should apply, the Commission found that no contract existed between the parties during the disputed period, and thus, the Commission applied a rate that it determined was just and reasonable. A public utility's rates must be "just and reasonable." Utah Code Ann. § 54–3–1 (Supp.2001). And, a utility must file all of its rates with the Commission. *See id.* § 54–3–2(1) (Supp.2001). A utility's rates cannot deviate from its rate schedules "on file and in effect at the time." *Id.* § 54–3–7 (Supp.2001).

¶ 11 More specifically, a utility cannot "recoup lost earnings caused by costs greater than projected or by revenues less than projected ... 'in order to guarantee shareholders the rate of return initially anticipated.'" *MCI Telecomms.,* 840 P.2d at 770 (quoting *Utah Dep't of Bus. Regulation v. Public Serv. Comm'n,* 720 P.2d 420, 423 (Utah 1986)). This "constitutes retroactive rate making." *Id.* But, the Commission "may, by rule or order, establish such exceptions" as it considers "just and reasonable." Utah Code Ann. § 54–3–7. The Utah Supreme Court has recognized exceptions to the retroactive rate making principle for "extraordinary and unforeseeable expenses or revenues" and "utility misconduct." *MCI Telecomms.,* 840 P.2d at 771, 774.

¶ 12 Neither the retroactive rate making principle nor its exceptions are implicated in this case because the utility was not trying to recoup lost earnings. Contrary to U.S. Mag's contention, the retroactive rate making principle is not a black letter guarantee that all utility rates must be announced in advance. Rather, the principle prohibits a utility from adjusting its projected rates to benefit its shareholders. That is not the case here; rather, there was no rate set for the disputed period. And accordingly, the Commission determined a "just and reasonable" rate as provided in statute. Utah Code Ann. § 54–3–1(1)(a).

¶ 13 We conclude that the Commission's order does not constitute retroactive rate making. Further, because the Commission set the rate as provided by statute, the Com-

mission properly exercised its authority. Thus, we affirm.

¶ 14 WE CONCUR: RUSSELL W. BENCH, Associate Presiding Judge and GREGORY K. ORME, Judge.